Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/22/2019 08:07 AM CST

State of Nebraska, appellee, v.
Tillman T. Henderson, appellant.
___ N.W.2d ___

Filed November 30, 2018.    No. S-17-535.

1. **Postconviction: Constitutional Law: Appeal and Error.** In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.

2. **Postconviction: Constitutional Law.** Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable.

3. **Postconviction: Appeal and Error.** On appeal from the denial of postconviction relief without an evidentiary hearing, the question is not whether the movant was entitled to relief by having made the requisite showing. Instead, it must be determined whether the allegations were sufficient to grant an evidentiary hearing.

4. **Postconviction: Pleadings.** The allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified.

5. **Postconviction: Pleadings: Proof: Constitutional Law.** In a proceeding under the Nebraska Postconviction Act, the application is required to allege facts which, if proved, constitute a violation or infringement of constitutional rights, and the pleading of mere conclusions of fact or of law is not sufficient to require the court to grant an evidentiary hearing.

6. **Postconviction: Proof: Constitutional Law.** A postconviction evidentiary hearing must be granted when the facts alleged, if proved, would justify relief, or when a factual dispute arises as to whether a constitutional right is being denied.

7. **Postconviction: Effectiveness of Counsel: Appeal and Error.** When a defendant was represented both at trial and on direct appeal by the same

counsel, the defendant's first opportunity to assert ineffective assistance of counsel is in a motion for postconviction relief.

8. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. A court may address the two prongs of this test, deficient performance and prejudice, in either order.

9. **Postconviction: Effectiveness of Counsel: Proof.** In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden first to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area.

10. **Effectiveness of Counsel: Presumptions.** In determining whether trial counsel's performance was deficient, courts give counsel's acts a strong presumption of reasonableness.

11. **Trial: Effectiveness of Counsel: Appeal and Error.** An appellate court will not judge an ineffectiveness of counsel claim in hindsight.

12. ____: ____: ____. An appellate court must assess trial counsel's performance from counsel's perspective when counsel provided the assistance.

13. ____: ____: ____. When reviewing claims of ineffective assistance, an appellate court will not second-guess trial counsel's reasonable strategic decisions.

14. **Effectiveness of Counsel: Proof.** To establish the prejudice prong of a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.

15. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

Appeal from the District Court for Douglas County: J Russell Derr, Judge. Affirmed.

Gregory A. Pivovar for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Welch, Judge.

Papik, J.

Tillman T. Henderson was convicted of first degree murder, attempted first degree murder, and related firearms offenses. We affirmed his convictions on direct appeal. See *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014). Henderson now appeals the order of the district court for Douglas County that denied his motion for postconviction relief without an evidentiary hearing. He alleges various claims of ineffective assistance of trial and appellate counsel. Finding that the district court did not err by denying Henderson's postconviction claims without an evidentiary hearing, we affirm.

## I. BACKGROUND

### 1. Trial

A detailed recitation of the evidence at trial can be found in our opinion on direct appeal. See *State v. Henderson, supra*.

In summary, Henderson was charged in connection with the shooting death of Matthew Voss and the nonfatal shooting of Antonio Washington. Evidence at Henderson's jury trial showed that in the early morning hours of February 18, 2012, Voss and Antonio Washington both sustained gunshot wounds after a fight broke out at an after-hours party in downtown Omaha, Nebraska. Witnesses reported seeing two men firing guns. After a person at the scene identified Henderson to a police officer as one of the shooters, police apprehended Henderson as he was running from the scene of the incident. Henderson was in possession of one gun when he was arrested, and a police officer saw him throw another gun under a vehicle as the officer was chasing him. Forensic evidence presented at trial tied bullets and casings found at the scene of the shootings to those guns. DNA testing indicated that blood found on clothing worn by Henderson had come from Voss.

The jury found Henderson guilty of first degree murder, attempted first degree murder, two counts of use of a deadly

weapon to commit a felony, and possession of a deadly weapon by a prohibited person.

## 2. Direct Appeal

Represented by the same counsel that represented him at trial, Henderson appealed his convictions. See *State v. Henderson, supra*. He made numerous assignments of error pertaining to pretrial and trial rulings. This court affirmed Henderson's convictions and sentences. The U.S. Supreme Court denied Henderson's petition for certiorari. See *Henderson v. Nebraska*, ___ U.S. ___, 135 S. Ct. 2845, 192 L. Ed. 2d 881 (2015).

## 3. Postconviction Proceedings

Following direct appeal, Henderson filed an application for postconviction relief. He alleged various instances of ineffective assistance of trial and appellate counsel. In response, the State filed a motion to dismiss. The district court denied postconviction relief without an evidentiary hearing. It determined that Henderson had failed to show either that he had received deficient representation or that he had suffered prejudice. Henderson now appeals that order.

## II. ASSIGNMENTS OF ERROR

Henderson assigns, rephrased and summarized, that the district court erred in denying him an evidentiary hearing on his application for postconviction relief, which alleged various instances of ineffective assistance of counsel at trial and on appeal.

## III. STANDARD OF REVIEW

[1] In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Torres*, 300 Neb. 694, 915 N.W.2d 596 (2018).

## IV. ANALYSIS

[2,3] Before turning to Henderson's specific arguments on appeal, we review the general principles governing postconviction actions asserting claims of ineffective assistance of counsel. Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable. *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018). On appeal from the denial of postconviction relief without an evidentiary hearing, the question is not whether the movant was entitled to relief by having made the requisite showing. Instead, it must be determined whether the allegations were sufficient to grant an evidentiary hearing. *Id.*

[4-6] The allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified. *Id.* In a proceeding under the Nebraska Postconviction Act, the application is required to allege facts which, if proved, constitute a violation or infringement of constitutional rights, and the pleading of mere conclusions of fact or of law is not sufficient to require the court to grant an evidentiary hearing. *Id.* An evidentiary hearing must be granted when the facts alleged, if proved, would justify relief, or when a factual dispute arises as to whether a constitutional right is being denied. *Id.*

[7,8] Here, Henderson bases his claim to postconviction relief on ineffective assistance of trial and appellate counsel. When, as here, a defendant was represented both at trial and on direct appeal by the same counsel, the defendant's first opportunity to assert ineffective assistance of counsel is in a motion for postconviction relief. *State v. Ely*, 295 Neb. 607, 889 N.W.2d 377 (2017). To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually

prejudiced the defendant's defense. *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018). A court may address the two prongs of this test, deficient performance and prejudice, in either order. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017).

[9-13] In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden first to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *State v. Haynes, supra*. In determining whether trial counsel's performance was deficient, courts give counsel's acts a strong presumption of reasonableness. *State v. Alfredson*, 287 Neb. 477, 842 N.W.2d 815 (2014). An appellate court will not judge an ineffectiveness of counsel claim in hindsight. *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011). We must assess trial counsel's performance from counsel's perspective when counsel provided the assistance. *Id.* When reviewing claims of ineffective assistance, we will not second-guess trial counsel's reasonable strategic decisions. *Id.*

[14] Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *State v. Haynes, supra*. To establish the prejudice prong of a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *State v. Schwaderer, supra*. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *State v. Custer*, 298 Neb. 279, 903 N.W.2d 911 (2017).

With these principles in mind, we turn to Henderson's arguments.

## 1. Alleged Failure to Call
### Other Witnesses

In his motion for postconviction relief, Henderson asserted that trial counsel was ineffective in failing to interview, depose, and call three additional witnesses to testify. He now contends that the district court erred in denying him an evidentiary hearing concerning these claims. For reasons explained below, we disagree.

### (a) Timothy Washington

First, Henderson claims his trial counsel should have called Timothy Washington. Henderson argues that had Timothy Washington been called to testify, he would have rebutted the testimony of a witness called by the State, Vasili Petrihos. At trial, Petrihos testified that a young black man, who was later apprehended and identified as Henderson, was "tensed up and all hyped up," "huffing and puffing," and "getting aggravated" and appeared "ready to fight" near the shooting site immediately prior to the shooting.

In his motion for postconviction relief, however, Henderson did not reference Petrihos or his testimony. Henderson asserted only that Timothy Washington was willing to testify about Henderson's "demeanor and the direction . . . Henderson had been headed . . . minutes before the shooting" and that such testimony could have impeached the testimony of other unspecified witnesses as to Henderson's whereabouts, demeanor, and actions in the minutes before the shooting. The motion did not explain what Timothy Washington would have testified regarding Henderson's location, demeanor, or direction.

The lack of explanation as to what Timothy Washington would have testified is relevant because in a motion for postconviction relief, a defendant is required to specifically allege what the testimony of potential witnesses would have been if they had been called. See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014). Absent specific allegations, a motion for postconviction relief is subject to dismissal

without an evidentiary hearing. See *id*. Because Henderson's motion did not describe Timothy Washington's alleged testimony with sufficient specificity, an evidentiary hearing was not warranted.

### (b) Deonta Marion

Next, Henderson asserts that he is entitled to postconviction relief because his trial counsel failed to call Deonta Marion. Henderson alleged in his motion for postconviction relief that Marion gave a statement to police regarding the shooting. Henderson attached a document to his motion that appears to be a police report documenting that statement. The report stated that Marion described one shooter as wearing a "'white or a light-colored short-sleeve shirt'" and the other as wearing "'dark clothing.'" Later in the report, the author noted that Marion had initially provided a false name to law enforcement. Henderson argues that had Marion been called, his testimony regarding the shooters' clothing would have undercut the State's theory that Henderson was one of the shooters because Henderson was wearing a tan "Carhartt" jacket when he was apprehended. Brief for appellant at 24.

We recently addressed two related cases in which defendants contended that trial counsel failed to call witnesses who would have identified the perpetrators of crimes as having different characteristics than the defendants charged with those crimes. In *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018), and *State v. Stricklin*, 300 Neb. 794, 916 N.W.2d 413 (2018), the codefendants, who were both African American, contended that their counsel deficiently failed to call witnesses. They claimed the witnesses would have testified that the perpetrators were unnamed "'Mexicans'" or "'Latino's.'" *State v. Newman*, 300 Neb. at 782, 916 N.W.2d at 406. Accord *State v. Stricklin, supra*. We concluded that these allegations did not show a reasonable likelihood that, absent the alleged deficiency, the outcome at trial would have been different.

In so finding, we applied the approach that the U.S. Supreme Court set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to analyze prejudice:

"In making [the prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."

*State v. Newman*, 300 Neb. at 782-83, 916 N.W.2d at 407, quoting *Strickland v. Washington, supra*. See, also, *State v. Stricklin, supra*. In both cases, we concluded that in the context of all the evidence adduced at trial, the omitted testimony "would not have altered the evidentiary picture and would, at best, have had an isolated or trivial effect on the jury's findings." See *State v. Newman*, 300 Neb. at 783, 916 N.W.2d at 407. Accord *State v. Stricklin, supra*.

Similarly, here, there is overwhelming evidentiary support for the jury's verdict, which we summarized on direct appeal:

Henderson was apprehended by police as he was running from the scene of the incident. A person who was at the scene had identified        Henderson to a police officer as one of the shooters. The other suspect was not apprehended. One gun was found on Henderson's person

when he was arrested, and a police officer saw Henderson throw another gun under a vehicle as the officer was chasing him.

Forensic evidence presented at trial indicated that bullets and casings found at the scene of the shootings had been fired from the gun found on Henderson and from the gun he was seen throwing under a vehicle. A fingerprint on the gun found under the vehicle matched Henderson's. In addition, DNA testing of blood found on the clothing worn by Henderson at the time of his arrest indicated that the blood had come from Voss.

The State maintained at trial that Henderson shot Voss and [Antonio] Washington to retaliate for an assault on Henderson's friend, Jimmy Levering. Levering and Voss had both been inmates at a prison in Florida, and Voss had allegedly stabbed and punched Levering.

*State v. Henderson*, 289 Neb. 271, 274-75, 854 N.W.2d 616, 624 (2014). In addition to the evidence quoted above, text messages obtained from a cell phone found on Henderson's person indicated that the two people exchanging the messages around the time of the shooting were attempting to meet one another outside the party where the shooting occurred and that the individual who stabbed "'Jb'" was there. *Id*. at 277, 854 N.W.2d at 625. The background of the cell phone's screen was a picture of Jimmy Levering.

When we weigh the effect of counsel's allegedly deficient failure to call Marion against the remaining evidence, we conclude that there is not a reasonable likelihood the outcome would have been different had Marion testified. Henderson's presence at the scene, his possession of the weapons used in the shooting, the blood matching the DNA profile of one of the victims on his clothing, and the evidence of his premeditative intent to retaliate against someone he believed to be present at the scene are highly suggestive of his guilt. To reach a different conclusion, the jury would have to find that just after Henderson had received a text message that someone

who had stabbed his acquaintance was at a party in downtown Omaha, Henderson went to such a party where someone else shot a person who had assaulted Henderson's friend Levering in prison when Henderson happened to be sufficiently nearby to get blood matching the DNA profile of the victim on his clothes, and that Henderson somehow took possession of both guns used in the crime and fled the scene with them. We find the likelihood of the jury's reaching such a conclusion to be exceedingly low.

Our prejudice analysis is also informed by the fact that Henderson relied on another account of the shooters' attire at trial but was unable to convince the jury of his innocence. The evidence showed that Henderson was apprehended wearing a tan Carhartt jacket that had a hood. However, an eyewitness, Charles Bird, testified that one shooter wore a light-colored or gray "hoodie" and the other wore a dark-colored hoodie. Henderson's counsel highlighted Bird's testimony during closing arguments, noting that the witness did not describe a tan jacket like Henderson wore that night. Even so, the jury found Henderson guilty.

The State points to Henderson's reliance on Bird's testimony and contends that it shows that Marion's testimony would not have made a difference. In this case, we agree. We can envision a circumstance in which testimony of a purported eyewitness that the perpetrator of a crime lacked certain characteristics of the defendant might corroborate similar testimony of another purported eyewitness and thus meaningfully assist the defense. However, for multiple reasons, we do not believe Marion's testimony would have had that effect here. First, it is not clear that Marion's testimony would have corroborated Bird's: Bird identified the shooters as wearing hoodies, and Marion identified one of the shooters as wearing a short-sleeved shirt. And even if the chance that Marion's testimony would undercut rather than corroborate Bird's is set to the side, the testimony would not necessarily have been exculpatory, because there was evidence that Henderson was wearing a white short-sleeved

shirt under his jacket. Finally, there is still the overwhelming evidence of Henderson's guilt set forth above. Given the nature of this evidence, we are convinced that the jury would have reacted to the testimony Henderson claims Marion would have given the same way it did to the testimony of Bird, which Henderson relied on at trial.

Because Marion's testimony would not have meaningfully altered the evidentiary picture and any impact on the jury's findings would have been isolated and trivial, we hold that the district court did not err in denying this claim of ineffective assistance of counsel without an evidentiary hearing.

### (c) Jermaine Westbrook

Finally, Henderson contends he should have received an evidentiary hearing on his claim that his counsel was ineffective for failing to call Jermaine Westbrook to testify. In his motion for postconviction relief, Henderson alleged that Westbrook called the 911 emergency dispatch service regarding a sport utility vehicle (SUV) following the shooting. The record does not contain a recording or transcript of Westbrook's 911 call, but Henderson attached a police report to his application for postconviction relief that summarized the call:

WESTBROOK . . . stated to [the] 911 operator that he is following the car that the shooter was in. . . . WESTBROOK stated the party inside this white SUV is the "accessory to the shooting". . . . WESTBROOK stated [that] after he saw the guys do the shooting, they went right on 16th and Harney. He stated that one of the shooters (masculine) shot the guy in broad (unaudible). 911 asked WESTBROOK if he knew who the shooters or the people in the vehicle were, to which the caller responded no. WESTBROOK further described one of the shooters as having a brown Carhart [sic] jacket on. He further stated that this suspect in the brown Carhart [sic] jacket was a black male, approximately five foot five, and short, and approximately 20-21 years old. . . . WESTBROOK

stated he lost sight of the taillights of the white SUV which the possible suspects were in.

Henderson contends that if Westbrook had been called to relay the substance of his 911 call, the testimony would have absolved Henderson because he fled the scene not in an SUV, but on foot. Henderson's motion alleges that Westbrook could have provided information about the departure from the scene of "at least one of the shooters." But the police report indicates that Westbrook claimed to be following the car that the "shooter," singular, was in. Henderson's motion and the attached exhibit do not explain how Westbrook could have provided information about the departure of more than one shooter. The lack of any such explanation is significant. Testimony by Westbrook that one unidentified shooter fled in an SUV would not have benefited Henderson. Evidence at trial established that there were two shooters. Evidence that the other suspect fled in an SUV would not have disproved the claim that Henderson shot Voss and Antonio Washington and then fled on foot.

As we have already stated, to establish the prejudice prong of a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). In assessing postconviction claims that trial counsel was ineffective in failing to call a particular witness, we have upheld dismissal without an evidentiary hearing where the motion did not include specific allegations regarding the testimony which the witness would have given if called. See, *State v. Thorpe*, 290 Neb. 149, 858 N.W.2d 890 (2015); *State v. Sellers*, 290 Neb. 18, 858 N.W.2d 577 (2015). And we have held that without such specific allegations, an application for postconviction relief has not alleged sufficient facts to establish a reasonable probability that the outcome of trial would have been different if trial counsel had called those witnesses. See *State v. Marks*, 286 Neb. 166, 835

N.W.2d 656 (2013). Here, Henderson's motion for postconviction relief does not contain the level of specificity needed to demonstrate that the outcome would have been different had Westbrook testified.

Even if it is assumed Westbrook would have testified to a belief that he was following an SUV in which both shooters were riding, we do not believe there is a reasonable probability that such testimony would have affected the outcome. In addition to the overwhelming evidence of Henderson's guilt recounted above, had Westbrook been called to testify, the State would assuredly have elicited from Westbrook another item contained in the police report summarizing Westbrook's 911 call—that Westbrook identified one shooter as a "black male" wearing a "brown Carhart [sic] jacket" and matching Henderson's physical description. We are confident that the jury would not have concluded that both shooters were in an SUV driving away from the scene when Westbrook's description of one of the shooters matched the clothing and physical characteristics of Henderson, who was running away from the scene of the shooting carrying both guns used and who was identified to police as the shooter. We find no error in the district court's denial of this claim without an evidentiary hearing.

## 2. ALLEGED FAILURE TO MOVE FOR GUNSHOT RESIDUE TESTING

Henderson also claims that his trial counsel provided ineffective assistance by failing to move for gunshot residue testing of other individuals at the scene of the shooting, including the victims. Henderson argues the district court's rejection of this claim without granting an evidentiary hearing was erroneous. Again, we disagree.

Henderson contends that gunshot residue swabs were taken from Voss, Antonio Washington, and two other individuals who were present at the scene. Henderson asserts that these swabs were never submitted for testing and that such testing

"could have implicated other suspects in the shooting" or provided him with "alternative theories of defense." Evidence introduced at trial, however, demonstrated that gunshot residue testing would not have made a difference. An officer involved in the investigation testified that a finding of gunshot residue on a person does not definitively show that the person had fired a gun, because a person can also come into contact with gunshot residue by being in the vicinity of gunfire. Because the individuals from whom gunshot residue swabs were obtained either were victims or were known to be at the scene, a finding of gunshot residue on them would not have implicated them or exculpated Henderson. In light of this testimony, the correctness of which Henderson does not dispute, Henderson's counsel could not have acted deficiently by not seeking gunshot residue testing and Henderson suffered no prejudice.

### 3. Alleged Failure to Move for and Compel DNA Testing

Henderson argues that he received ineffective assistance when his trial counsel failed to move for DNA testing on a sample taken from Jeremy Terrell.

As previously mentioned, shortly before the shooting, text messages were sent from the cell phone found on Henderson's person. Those messages were responses to text messages from a telephone number assigned to Terrell, also referred to as "Jay Town." The correspondence indicated that "Jay Town" and the recipient were attempting to meet one another outside the after-hours party where the shooting occurred and that the individual who stabbed "Jb" was there. Terrell was not apprehended at the scene of the shootings. Police later attempted to interview him, but he refused to provide any information. Police obtained a DNA sample from Terrell, but the sample was not tested.

Law enforcement conducted DNA testing on samples taken only from Henderson and Voss. That testing led to the conclusion that blood found on Henderson's shirt and shoes had

come from Voss. It also showed a mixture of DNA from at least three people on the grip of one of the guns recovered upon Henderson's arrest, but testing could not show the identities of those sources with any degree of certainty. A DNA analyst explained that because of the mixture, many people could be indicated and the probability that a random individual matched a DNA profile found in the mixture was 1 in 3 for Caucasians, 1 in 2 for African Americans, and 1 in 4 for Hispanic Americans. The DNA analyst testified that consequently, test results comparing the mixture to Henderson's and Voss' DNA were inconclusive, meaning that she could not be certain whether either man's DNA was present or not present on the gun grip.

In his application for postconviction relief, Henderson referenced the mixture of DNA from at least three people and alleged that testing Terrell's sample "may have" exculpated Henderson on its own or led to a more thorough investigation that "could have" revealed more evidence pointing to "the actual shooters." Even if we were to consider Henderson's allegation sufficiently specific, he has failed to show ineffective assistance of counsel. The DNA analyst's testimony suggests that even if Terrell's DNA sample had been tested and compared to the DNA mixture on the gun grip, the result would have been inconclusive, and Henderson makes no allegation that the DNA analyst's testimony was incorrect. Therefore, Henderson's motion failed to show a reasonable probability that DNA testing would have resulted in a different outcome at trial. In the absence of any prejudice to Henderson, then, the district court did not err in denying Henderson an evidentiary hearing concerning DNA testing.

### 4. Allegedly Ineffective Response to Evidence of Gang Affiliation

Henderson also asserts that his trial counsel ineffectively responded to evidence at trial concerning gang affiliation. Henderson contends that his trial counsel (1) should have taken

various measures after a police officer testified that Levering was "kind of an infamous gang member" and (2) should have objected to the admission of pictures of Levering in which Henderson claims Levering is making gang-related hand gestures as unfairly prejudicial. Again, we find no error with the district court's disposition of this claim.

### (a) Statement Regarding Levering

The reference to Levering's being "kind of an infamous gang member" came about when Det. Nick Herfordt was testifying regarding the contents of the cell phone found on Henderson when he was arrested. Herfordt identified a background picture on the cell phone as a photograph of Levering, and when asked how he knew that, he answered, "I worked Northeast Omaha when I was in uniform, and . . . Levering, I guess, was kind of an infamous gang member . . . ."

Henderson immediately moved for a mistrial, noting that the State had agreed in connection with Henderson's pretrial motion in limine that it would not introduce evidence regarding gang affiliations. The trial court denied the motion. The trial court later asked Henderson's counsel whether he was moving to strike Herfordt's answer, and Henderson's counsel stated he was not.

Henderson now argues his trial counsel should have done more to respond to Herfordt's statement. Henderson details various measures he contends trial counsel should have employed, including further pressing the motion for a mistrial, asking that the testimony be stricken, or requesting an admonition or limiting instruction.

On direct appeal, however, we rejected Henderson's contention that he was prejudiced by the trial court's denial of his motion for a mistrial. In doing so, we observed that Herfordt's gang reference "was an isolated comment" and that the State did not present any other evidence of gang affiliation on the part of Henderson or anyone else. *State v. Henderson*, 289 Neb. 271, 299, 854 N.W.2d 616, 639 (2014). These same facts

lead us to conclude that Henderson could not show that he was prejudiced by his counsel's failure to take additional steps concerning the comment.

### (b) Pictures of Levering

Henderson also contends his trial counsel was deficient for not objecting to the admission of pictures of Levering as unfairly prejudicial. According to Henderson, Levering is making gang-related hand gestures in the pictures. However, there was no testimony that Levering's hand gestures were gang related. Furthermore, on direct appeal, we did not consider the photograph itself to be evidence of gang affiliation; we determined that other than the "'infamous gang member'" reference, "the State did not present . . . evidence of gang affiliations." *Id*. at 298, 299, 854 N.W.2d at 638, 639. Having already decided that the photograph of Levering does not constitute evidence of gang affiliation, we will not revisit the issue on postconviction review. See *State v. Thorpe*, 290 Neb. 149, 156, 858 N.W.2d 880, 887 (2015) ("[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased").

### 5. Allegedly Ineffective Response to Text Message Evidence

Henderson alleges several instances of ineffective assistance of counsel relating to a series of text messages admitted at trial. The text messages were from a cell phone found on Henderson at the time of his arrest. Henderson's counsel moved unsuccessfully to suppress the messages and also attempted to exclude evidence from the cell phone via a motion in limine and objections at trial.

On direct appeal, Henderson assigned that the trial court erred in overruling his second motion to suppress evidence obtained from his cell phone and admitting that evidence, including text messages and pictures. This court concluded that the district court had not erred when it overruled the motion

to suppress or when it admitted evidence obtained from the search over Henderson's Fourth Amendment objections. We also concluded that the district court did not err in admitting the cell phone evidence over Henderson's objections based on hearsay and lack of foundation establishing a chain of custody. Henderson now claims his counsel was ineffective for not taking various other steps in response to the text messages. We disagree as we explain in the sections below.

(a) Authentication of Text Messages

First, Henderson contends his counsel was ineffective for not objecting to a lack of "authentication that . . . Henderson was the one receiving or sending those text messages." According to Henderson, the State would have been unable to oppose an authentication objection by proving that Henderson was involved in the text messages.

The State's burden of authentication for text messages is relatively low. The proponent of text messages is not required to conclusively prove who authored the messages and can establish foundation through the context of the messages and testimony that the number belonged to or was regularly utilized by the alleged sender. See *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016). Although Henderson asserts that the State would not have been able to do so had he objected, he alleges no facts to support this assertion. As pleadings of mere conclusions of fact or law are not sufficient to require the court to grant an evidentiary hearing, we find that the district court did not err in denying this claim without an evidentiary hearing. See *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018).

(b) Limiting Instruction

At trial, Henderson's counsel proposed the following instruction regarding the text messages:

During this trial the Court admitted some evidence that was received for a specific limited purpose. Specifically, the incoming text messages received into evidence from

the cell phone of [Henderson were] offered to show [Henderson's] state of mind. The content of the text messages was not received for the purpose of showing the truth of the matter asserted in the incoming text messages. You may consider the evidence only for the limited purpose for which it was received and for no other purpose.

The trial court declined to give this instruction. On direct appeal, we determined that the text messages were admitted not for the truth of the statements contained therein but instead for the purpose of showing their effect on Henderson and were thus not hearsay. We did not address the limiting instruction because Henderson's appellate counsel did not properly raise the issue on direct appeal. Henderson alleged in his postconviction motion that his appellate counsel was deficient in failing to do so and now alleges on appeal that the district court erred in denying him an evidentiary hearing to address the issue.

We conclude that Henderson was not entitled to an evidentiary hearing on this matter. Even if Henderson's appellate counsel had raised the limiting instruction on appeal, it would not have been grounds for a reversal of his convictions. We perceive little danger that the jury improperly deliberated by considering the text messages for the truth of the matter asserted. The facts asserted in the messages were that an individual had stabbed "Jb" and that the individual was in the same area as the author of the text messages. Whether those facts were true was immaterial. Regardless of whether "Jb" had actually been stabbed, whether the suspected individual had done it, or whether that person was in the area described, the text messages would have suggested that Henderson went to the area of the shootings with the intent of retaliating against the individual who he believed stabbed his acquaintance. And this was the nonhearsay purpose for which they were admitted. No limiting instruction was necessary to prevent the jury from considering the truth of the statements in the text messages.

### (c) Brief Supporting Second
### Motion to Suppress

In his application for postconviction relief, Henderson asserted that his trial counsel was ineffective in failing to properly brief the trial court concerning the text messages before a suppression hearing on the second search warrant. Based on a few words uttered by his trial counsel at a hearing on the matter, he contended that his trial counsel's brief only addressed the second search warrant's validity, not the suppression of evidence. But the record affirmatively refutes this claim. Both the second motion to suppress and the brief supporting it sought to suppress evidence obtained as a result of the second search warrant, and Henderson's counsel affirmed this objective later at the same hearing. In addition, we considered Henderson's motions to suppress on direct appeal and ultimately determined that the trial court did not err in overruling them. This allegation is refuted by the record.

### (d) Timing of Search

Henderson asserts that the district court should have granted him an evidentiary hearing concerning contents from the cell phone that he believes police may have accessed before obtaining a search warrant. He refers to two allegations of ineffective assistance of counsel from his motion for postconviction relief: (1) that his trial counsel failed to mount a Fourth Amendment challenge to the Omaha Police Department's search to obtain the telephone number from the cell phone before securing a search warrant and (2) that his trial and appellate counsel failed to pursue Fourth Amendment objections to the download of data from the cell phone that "potentially could have occurred" before police obtained a search warrant. But Henderson did not show ineffective assistance of counsel in either regard.

As to obtaining the telephone number from the cell phone, Henderson can show no prejudice. The record shows that police obtained the telephone number prior to applying for

any search warrant and that the telephone number was not necessary for that application. But no evidence at trial utilized the telephone number to demonstrate that the cell phone belonged to Henderson; nor was the telephone number used to obtain other evidence through telephone records. The key evidence from the cell phone—photographs of Levering and the "J Town" text messages—was downloaded from the cell phone itself. Based on the record, we cannot discern how Henderson could have suffered prejudice when his counsel did not argue that the telephone number was prematurely obtained.

Henderson's claim that data was downloaded from the cell phone before police obtained the search warrant also fails, because the record refutes it. Henderson relies on testimony by the officer who applied for the search warrant that he was uncertain whether information was downloaded on the day the search warrant was obtained. According to Henderson, this suggests the possibility that the download occurred before police secured the search warrant and that his counsel was ineffective in not pursuing the issue. However, the record demonstrates no such possibility. The same officer testified that police waited until after obtaining the first search warrant to download data and that the second search warrant was executed in the same manner. Because the record refutes this claim, Henderson cannot demonstrate ineffective assistance of trial or appellate counsel.

## 6. Allegedly Ineffective Response to Testimony of Ramone Narvaez

Next, Henderson asserts that he received ineffective assistance both at trial and on appeal concerning his counsel's response to testimony of Ramone Narvaez. Narvaez, a correctional officer from a federal penitentiary in Florida, testified that in 2009, he witnessed an altercation between Levering and an inmate named "Voss." As noted above, the State contended that Henderson shot Voss and Antonio Washington to retaliate for an assault on Henderson's friend, Levering. Henderson

argues his trial counsel provided ineffective assistance by failing to object to the Narvaez testimony on relevance grounds until after it was complete and that his appellate counsel provided ineffective assistance by failing to contend the testimony was irrelevant on appeal.

Henderson cannot establish that he received ineffective assistance of counsel regarding the Narvaez testimony. Contrary to Henderson's assertion, the relevance and allegedly prejudicial nature of the Narvaez testimony was addressed on direct appeal. We specifically stated that the testimony was "relevant to the State's case and was not unfairly prejudicial." *State v. Henderson*, 289 Neb. 271, 301, 854 N.W.2d 616, 640 (2014). Because we have already rejected the evidentiary objections that Henderson contends his counsel should have raised, the record refutes Henderson's claim that his appellate counsel failed to raise the issue of relevance on appeal, and we need not revisit whether his trial counsel was ineffective in not objecting on relevance grounds during Narvaez' testimony. See *State v. Thorpe*, 290 Neb. 149, 858 N.W.2d 880 (2015).

### 7. Alleged Failure to Request Lesser-Included Offense Instruction

Henderson was charged and convicted of the attempted first degree murder of Antonio Washington. He claims his trial counsel was ineffective in not requesting lesser-included offense instructions on that charge. But, in fact, the trial court *did* instruct the jury on the elements of second degree murder and informed the jury that it could find Henderson guilty of first degree murder or second degree murder or find him not guilty. Furthermore, Henderson did not identify any other lesser-included offenses in his postconviction motion or explain why the result of the proceeding would have been different had the jury been instructed on those offenses. Because Henderson's allegations were not sufficiently specific for the district court to make a determination as to whether an

evidentiary hearing was required, the district court did not err in denying Henderson's claim without an evidentiary hearing. See *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018).

### 8. Alleged Failure to Object to Pictures of Coat

Photographs of a coat were received at trial without objection. Testimony at trial established that the coat in the photographs was the Carhartt jacket worn by Henderson when police apprehended him. The detective who identified the photographs testified without objection that the coat had blood on it. DNA testing was not performed on this blood, but as noted above, DNA testing showed that Voss' blood was on Henderson's shirt and shoes.

Henderson asserts his counsel was deficient in failing to make authentication or prejudice objections to the admission of photographs of the coat. He noted that no evidence was presented that the blood on the coat was ever tested and matched to either victim. Henderson claimed that allowing the jury to see photographs of "an untested and supposedly blood-stained article of clothing" denied him a fair trial.

We fail to see how testimony that there was blood on Henderson's jacket prejudiced Henderson's defense. Henderson conceded that he was at the scene of the shootings. In addition, Voss' blood was found on Henderson's shirt and shoes. Given evidence that Henderson was not only present at the scene but also sufficiently close to Voss to get Voss' blood on his clothing, we do not believe additional testimony suggesting there was blood on his coat "altered the evidentiary picture." See *State v. Newman*, 300 Neb. 770, 783, 916 N.W.2d 393, 407 (2018). Accordingly, the district court did not err by denying this claim without an evidentiary hearing.

### 9. Alleged Failure to Investigate Witness Tampering

Henderson also claims that he received ineffective assistance because his trial counsel did not pursue claims of witness

tampering. In his postconviction motion, Henderson states that although Antonio Washington testified that he did not know Matthew Voss, their "families were close friends" and Voss' mother asked Antonio Washington to do what he could to keep Henderson in prison. Henderson says that this motivated Antonio Washington to lie in his testimony at trial, but that Henderson's counsel did not investigate or pursue the matter when Henderson reported it.

We find that Henderson has not sufficiently alleged how an investigation on the part of Henderson's counsel would have made a difference. Henderson has not described what would have been discovered during any additional investigation or explained what testimony of Antonio Washington was untrue or how it made a difference to the result. Without such allegations, he has failed to allege facts that would entitle him to an evidentiary hearing. See *State v. Haynes, supra*.

### 10. ALLEGED MISSTATEMENT
#### OF TESTIMONY

Henderson also claims his trial counsel misstated testimony in a way that prejudiced his defense during his cross-examination of Petrihos. Petrihos testified during his direct examination that before the shooting, he saw an individual pass something "metallic [and] black" to "a younger black male," later identified as Henderson. The following colloquy between Petrihos and Henderson's counsel then took place during cross-examination:

Q [by Henderson's counsel]: And you're that close to that and you — you couldn't tell it was a gun?

A [by Petrihos]: No, sir.

Q: I think, in fact, you didn't — you thought it might have been brass knuckles?

A: It looked — something metal. I didn't know. It [sic] didn't — didn't really think it was a gun. Didn't really think — I don't know — didn't really think it was a gun.

Q: And you can't tell us what this black male was wearing that was handed the gun?

A: From a year ago? No, sir, I can't.

[15] Henderson argues that his counsel's reference to the object's being a gun constituted ineffective assistance. The record, however, affirmatively refutes Henderson's claim. It is apparent from the record that counsel was trying to create doubt the object was a gun and doubt regarding Petrihos' general credibility and that the reference to the object as a gun was a momentary and inconsequential slip of the tongue. Moments before, Henderson's counsel asked Petrihos a leading question about whether he thought the object was a set of brass knuckles and Petrihos responded that he did not think it was a gun. Later, counsel again referred to the object as a gun but immediately corrected himself. Moreover, the jury was instructed that "[s]tatements, arguments, and questions of the lawyers for the State and [Henderson]" are not evidence. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016). Consequently, we conclude that the district court did not err in denying an evidentiary hearing concerning trial counsel's misstatement.

## 11. Failure to Argue *State v. Tompkins* on Appeal

Finally, Henderson alleges that his appellate counsel was ineffective for not arguing that our opinion in *State v. Tompkins*, 272 Neb. 547, 723 N.W.2d 344 (2006), *modified on denial of rehearing* 272 Neb. 865, 727 N.W.2d 423 (2007), precluded us from finding, as argued by the State on direct appeal, that text messages from the cell phone found on Henderson were admissible under the good faith exception to the exclusionary rule. Henderson contends that the State did not raise the good faith exception at trial and that as a result, *Tompkins* precluded the State from raising it on appeal.

It is not entirely clear that the State did not raise the good faith exception to the trial court in some fashion. Although the State cannot point to any indication in the record that it did, we note that the record does show that Henderson's counsel argued at trial that the good faith exception did not apply. At the very least, then, Henderson's counsel was aware of the potential applicability of the exception and took the opportunity to argue against it.

In any event, we do not need to determine whether the State actually raised the good faith exception in the trial court in order to resolve this assignment of error. In *State v. Tompkins, supra*, the sole issue on appeal was whether an appellate court may consider the good faith exception sua sponte. We concluded that it may not, reasoning that if the court finds the exception applies on the court's own initiative, the defendant is given no chance to make arguments to the contrary. *Tompkins* thus does not answer the question of whether the State may raise the good faith exception for the first time on appeal.

In *Tompkins*, we did cite *U.S. v. Hahn*, 922 F.2d 243 (5th Cir. 1991), a case in which a federal appellate court declined to apply the exception because the prosecution had not raised the issue before the trial court. Henderson seems to contend that if his appellate counsel had cited *Tompkins*, we would have, in reliance on *Hahn*, extended *Tompkins* to say that we could not consider the good faith exception because it was not raised at trial. But in fact, *Hahn* itself did not categorically hold that the prosecution could never raise the good faith exception for the first time on appeal. Rather, the court pointed out that the defendant had "not had a fair opportunity to factually respond" to the assertion of the good faith exception, and because of that and other reasons unique to that case, "considerations of fairness and the orderly administration of justice tip[ped] the scales in favor" of not considering the good faith exception. *U.S. v. Hahn*, 922 F.2d at 248.

In this case, Henderson cannot claim that he did not have an opportunity to factually address the potential applicability

of the good faith exception. As noted above, his counsel expressly argued at trial that the exception did not apply. Thus, even assuming for the sake of argument that we could have been convinced to follow *Hahn*, it would not have precluded our consideration of the good faith exception in Henderson's direct appeal. Because the result of Henderson's direct appeal would have been no different had his counsel cited *Tompkins*, we find no merit to this assignment of error.

## V. CONCLUSION

For the foregoing reasons, we affirm the order of the district court denying Henderson's motion for postconviction relief without an evidentiary hearing.

AFFIRMED.

FREUDENBERG, J., not participating.