Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/06/2023 09:04 AM CST

STATE OF NEBRASKA, APPELLEE, V.
PAUL D. BERSHON, APPELLANT.

___ N.W.2d ___

Filed January 6, 2023.    No. S-21-656.

1. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

2. **Indictments and Informations: Pleadings.** Objections to the form or content of an information should be raised by a motion to quash.

3. **Pleas: Indictments and Informations: Waiver.** When a defendant enters a plea in a case, he or she waives objections to all defects in an information that can be reached by a motion to quash, except those defects which are of such a fundamental character as to make the indictment wholly invalid.

4. **Constitutional Law: Appeal and Error.** A constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal.

5. **Convictions: Evidence: Appeal and Error.** When a defendant is charged in alternative ways with committing an offense, the jury can convict if it finds there is sufficient evidence of either alternative, and thus the judgment of conviction must be affirmed if the evidence is sufficient to support either of the State's alternative theories of guilt.

6. **Sexual Assault: Words and Phrases.** "Coercion" in Neb. Rev. Stat. § 28-318(8)(a)(i) (Reissue 2016) includes nonphysical force.

Appeal from the District Court for Washington County: John E. Samson, Judge. Affirmed.

Michael J. Wilson, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Paul D. Bershon appeals his 19 convictions in the district court for Washington County consisting of 13 counts of first degree sexual assault, 3 counts of incest, and 3 counts of intentional abuse of a vulnerable adult. Bershon claims that his convictions for 17 of the 19 counts violate his due process rights, because he was not provided adequate notice of the charges against him and because the multiple convictions subjected him to double jeopardy. Bershon also claims that there was not sufficient evidence to support his 13 convictions for first degree sexual assault, because the State did not show that the victim was mentally incapable of resisting or appraising the nature of sexual conduct or that she had expressed a lack of consent in an observable manner. He further claims that there was not sufficient evidence to support his three convictions for intentional abuse of a vulnerable adult, because the State did not show that the victim was sexually abused. We affirm Bershon's convictions.

## STATEMENT OF FACTS

The operative information in this case charged Bershon with 13 counts of first degree sexual assault, 3 counts of incest, and 3 counts of intentional abuse of a vulnerable adult. The victim, with respect to each charge, was Bershon's stepdaughter, B.B., who is intellectually disabled.

B.B. was born in late December 1990, when her mother, Pam Leman, was married to B.B.'s father. B.B.'s parents divorced a few years later, and Leman married Bershon in 2000. Leman and Bershon had two children together, born in 2001 and 2002, respectively. The family, including Leman, Bershon, B.B., and the two younger children moved to a home in Blair, Nebraska, in 2006.

The investigation that led to the charges against Bershon began on May 21, 2018, when Leman reported to law enforcement that on May 16, she had walked into the kitchen of the family home and found B.B. being sexually abused by Bershon. Law enforcement officers interviewed B.B. about the May 16 incident, and in later interviews, B.B. reported that Bershon had been sexually abusing her over a period of years beginning in 2006 when they moved to the house in Blair.

In the original complaint filed in the county court on March 12, 2021, and in the original information filed in the district court on March 30, the State charged Bershon with 13 counts of first degree sexual assault, 3 counts of incest, and 10 counts of intentional abuse of a vulnerable adult. Bershon filed a motion to quash in which he asserted that seven counts of intentional abuse of a vulnerable adult that were charged as having occurred in 2015 and prior years were time barred under the 6-year statute of limitations for the offense as set forth in Neb. Rev. Stat. § 29-110(9) (Reissue 2016). In the motion to quash, Bershon made no allegations regarding due process, double jeopardy, or lack of notice, and he did not move to quash any counts other than the seven counts of intentional abuse of a vulnerable adult.

The district court granted the motion to quash and ordered the six counts of intentional abuse of a vulnerable adult related to the years 2009 through 2014 dismissed with prejudice, but the court allowed the State time to amend the count related to the year 2015 to the extent it could be amended to allege an offense occurring on or after March 12, 2015. In response, the State amended the information to allege four counts of

intentional abuse of a vulnerable adult, including one alleged to have occurred between March 12 and December 31, 2015, but it later further amended the information to omit that count and to allege only three counts of intentional abuse of a vulnerable adult related to the years 2016, 2017, and 2018, respectively. Those three counts went to trial.

In the operative information, the State alleged 13 counts of first degree sexual assault in violation of Neb. Rev. Stat. § 28-319 (Reissue 2016), which provides in relevant part that one commits first degree sexual assault if one "subjects another person to sexual penetration (a) without the consent of the victim, [or] (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct." In each of the 13 counts, the State alleged that Bershon had subjected B.B. to "sexual penetration: (a) without the consent of the victim, (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct." In the first 12 of the 13 counts of first degree sexual assault, the State alleged that the offense occurred on or about January 1 through December 31 of each of the years from 2006 through 2017, respectively. In the 13th count, the State alleged that the offense occurred "[o]n or about May 16, 2018."

The State also charged three counts of incest in violation of Neb. Rev. Stat. § 28-703 (Reissue 2008), which, prior to 2015, provided that one commits incest if one "engages in sexual penetration with his or her minor stepchild." In each of the three counts of incest in the operative information, the State alleged that Bershon had "engaged in sexual penetration with his . . . minor stepchild." The first two counts were alleged to have occurred between January 1 and December 31 in the years 2006 and 2007, respectively. The third count was alleged to have occurred between January 1 and December 25, 2008. B.B. turned 18 years old in late December 2008.

The State finally charged three counts of intentional abuse of a vulnerable adult in violation of Neb. Rev. Stat. § 28-386

(Reissue 2016), which provides in relevant part that a "person commits knowing and intentional abuse . . . of a vulnerable adult . . . if he or she through a knowing and intentional act causes or permits a vulnerable adult . . . to be: (a) Physically injured; [or] (c) Sexually abused." In each of the three counts of intentional abuse of a vulnerable adult in the operative information, the State alleged that Bershon had "through a knowing and intentional act, cause[d] or permit[ted] a vulnerable adult to be (a) physically injured; (c) sexually abused." The first two counts of intentional abuse of a vulnerable adult were alleged to have occurred between May 1 and December 31, 2016, and between January 1 and December 31, 2017, respectively, and the third count was alleged to have happened "[o]n or about May 16, 2018."

At the jury trial, the State presented evidence including, inter alia, testimony by Leman, by B.B., by law enforcement officers who investigated the charges against Bershon, and by professionals who had evaluated or counseled B.B. The law enforcement officers generally testified that on May 21, 2018, Leman had reported an incident involving Bershon and B.B. that had occurred on May 16, and that in later interviews, B.B. reported incidents that had occurred over a period of years prior to that date.

Leman first testified regarding general family matters, including her prior marriage to B.B.'s father, B.B.'s birth in December 1990, her marriage to Bershon in 2000, the birth of their two children in 2001 and 2002, and the family's move to Blair in 2006. Leman's testimony then focused on B.B., and Leman described her as having "an eight- or nine-year-old mentality in a young woman's body." Leman described physical and medical issues that B.B. had that were apparent since birth. Leman testified that around the time B.B. was to start school, Leman became aware that B.B. had certain cognitive or intellectual disabilities and she held B.B. back from starting school for a year. When B.B. started school, it was determined that she could not be in the main classroom; instead, she was

placed into a special needs program, where she remained through her entire school career. B.B. was subject to an individualized education plan.

Leman testified that B.B. was not diagnosed with a specific intellectual disability, but that she was determined to be learning disabled and was expected to remain at the same level of functioning through her life. Leman also testified that B.B. qualified to receive benefits from the Social Security Administration based on an intellectual disability. Leman testified that as an adult, B.B. was still not capable of living alone and could not perform functions such as driving a car, operating an oven, balancing a checkbook, or shopping for groceries. Leman testified that if she or other family members were no longer able to care for B.B., B.B. would need to live in some type of care facility.

Leman's testimony then focused on the events of May 16, 2018. Leman testified that her normal morning routine was that she would shower and then stay in the bathroom to finish getting ready and dressed. But that morning, after she finished showering, Leman walked down the hallway to tell Bershon something. When she walked into the kitchen, she saw Bershon standing in a corner of the kitchen with his robe open and wearing nothing underneath the robe. B.B. was bent over in front of Bershon facing him and with her head at his waist level. When B.B. heard Leman entering the kitchen, she jumped up startled and ran to her bedroom. Leman saw that Bershon had an erection, and Bershon immediately closed his robe after B.B. jumped up. Leman testified that after seeing this, she screamed "Oh My God" multiple times and that she heard Bershon say, "I'm lonely and she wants to." Leman then picked up a rifle that was in the dining room, and she headed toward Bershon, who got down on his knees. Leman held the rifle to Bershon's head, and he said, "[P]lease don't kill me." Leman did not pull the trigger.

Leman testified that after the incident, Bershon went outside. After Leman eventually got B.B. to come out of her

room, she made sure that B.B. was never alone and she attempted to keep B.B. from being around Bershon the rest of that day. Leman testified that Bershon left the residence the next day to stay at a motel and that the day after that, he left Blair to go and stay with a relative in Colorado. Leman testified that she did not report the May 16, 2018, incident to law enforcement until May 21 because she was "in such shock, just a daze." She eventually reported the incident because she "was urged by friends to call."

On cross-examination, Leman testified that it was not until she reported the May 16, 2018, incident to law enforcement that she learned that such incidents had been going on for years. She testified that in the years prior to 2018, she had never seen anything that made her think anything inappropriate was going on and that B.B. had never said anything to her. On redirect, Leman testified that she did not manipulate or program B.B. to accuse Bershon of molesting her.

B.B. testified that throughout her school years, she was "in a resource room" and that she "had help with any subject that [she] took." She testified that she graduated high school when she was "[s]omewhere in [her] twenties."

With regard to the May 16, 2018, incident, although she could not identify the specific date it occurred, B.B. testified regarding an incident that occurred between her and Bershon in the kitchen. She testified that she was "sucking on his private" when "he smacked me on the head and then my mom came in." B.B. clarified that by "private" she meant his penis and that by "sucking" she meant that his penis was in her mouth. B.B. testified that she did not know why she had done it, that she knew it was wrong, and that she was scared that her mother was mad at her.

B.B. testified that she understood sex to be "[w]hen a man puts his you know what in you." She clarified that she meant "his dick," which she agreed meant his penis. B.B. testified that she and Bershon had had sex in the house in Blair. She testified that it had happened when her mother was gone and

that it had happened "a lot." B.B. stated that by "a lot" she meant "[a] hundred times." B.B. agreed that by "sex" she meant that Bershon put his penis inside her vagina. She testified that it was Bershon's idea and that she did not say no, because she was scared.

B.B. testified that Bershon started having sex with her in 2006 when they moved to the house in Blair. B.B. also testified that there were times when Bershon would put his penis in her mouth and that "goo or juice would come out" of it. When asked whether such incidents had "happened throughout the years from 2006 to 2018" and whether "it happened every year that [she] lived in" the house in Blair, B.B. replied, "Yes." B.B. testified that she did not tell her mother what was happening, because she was "scared to tell her" and she "was afraid [Leman and Bershon] would like get into a fight or divorce." B.B. also testified that there were times that Bershon would get into the shower with her and would touch her "[d]own in [her] — the V word." She agreed that she meant her vagina and that Bershon put his fingers inside.

On cross-examination, Bershon's counsel asked B.B. with respect to each year from 2007 through 2018 whether she remembered Bershon having sex with her or touching her in that specific year. B.B. replied to each question by stating that she did not remember. On redirect, B.B. agreed that when she was under stress or confused, it was easier for her to say she did not remember, and she testified that it was something she did "[l]ike all the time."

Other witnesses at trial testified regarding B.B.'s mental capacity and limitations. A school psychologist who worked for the schools in Blair testified that B.B. was put into a special education program when she transferred into the Blair schools. He testified that testing on B.B. in 2007 showed that she had an IQ of 48 and that she was classified as having a "mental handicap" based on her IQ score, as well as "her achievement scores, her reading skills, her math skills, [and] her writing skills." He testified that B.B.'s "academic skills

would have been for the most part clustered at late elementary, fourth through sixth grade" and that she remained in special education throughout her high school years.

A clinical psychologist who performed a psychological assessment of B.B. in December 2018 testified that the assessment showed B.B. had an IQ of 63 which was considered as being "extremely low range." The clinical psychologist diagnosed B.B. as having a "mild intellectual disability" as well as "major depressive disorder" and "recurrent, mild, . . . unspecified anxiety disorder."

Finally, a counselor who provided therapy for B.B. beginning in July 2018 testified that she diagnosed B.B. with post-traumatic stress disorder and that her symptomology was consistent with having suffered sexual abuse or sexual trauma.

After the State rested its case, Bershon moved for a directed verdict on all counts. With regard to the 17 counts related to years prior to 2018, he argued that there was a lack of evidence, because B.B. testified upon cross-examination that she could not remember whether sexual abuse occurred in each of the respective years from 2006 through 2017. With regard to the counts of intentional abuse of a vulnerable adult, he argued that although there was testimony regarding B.B.'s IQ and her intellectual disability, there was no expert testimony to show that she was a vulnerable adult or that she lacked decision-making capacity. Bershon made no argument regarding due process or double jeopardy in connection with the motion for directed verdict. The court overruled Bershon's motion for directed verdict. After he rested his defense, Bershon renewed the motion for directed verdict and the court again overruled the motion.

The jury found Bershon guilty of all 13 counts of first degree sexual assault, all 3 counts of incest, and all 3 counts of intentional abuse of a vulnerable adult. The court thereafter sentenced Bershon to imprisonment for 40 to 45 years for each of the first degree sexual assault convictions, for

2 to 3 years for each of the incest convictions, and for 2 to 3 years for each of the intentional abuse of a vulnerable adult convictions. The court ordered that the sentences for the 3 incest convictions and for the 10 first degree sexual assault convictions that were related to the years 2006 through 2015 be served concurrently to one another, that the sentences for the 3 intentional abuse of a vulnerable convictions and for the 3 first degree sexual assault convictions related to the years 2016 through 2018 be served concurrently to one another, and that the two sets of concurrent sentences be served consecutively to one another.

Bershon appeals his convictions.

## ASSIGNMENTS OF ERROR

Bershon generally makes two groups of assignments of error: the first arguments involve legal issues, and the second arguments involve sufficiency of evidence. Bershon specifically claims that his convictions for all counts other than the two counts alleged to have occurred on or about May 16, 2018, were in violation of his due process rights, because (1) he was not provided adequate notice of the charges and (2) the multiple convictions subjected him to double jeopardy. Bershon also claims that there was not sufficient evidence to support his 13 convictions for first degree sexual assault, because there was not sufficient evidence that B.B. was mentally incapable of resisting or appraising the nature of the sexual conduct, nor was there sufficient evidence that B.B. expressed a lack of consent in an observable manner. Bershon finally claims there was not sufficient evidence to support his three convictions for intentional abuse of a vulnerable adult, because there was not sufficient evidence that B.B. was sexually abused.

## STANDARD OF REVIEW

[1] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of

the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022).

## ANALYSIS

*Bershon Failed to Raise Due Process and Double
Jeopardy Issues in the District Court and
Waived the Issues for Appeal.*

Bershon first claims that 17 of his convictions were in violation of his due process rights, because (1) he was not provided adequate notice of the charges and (2) the multiple convictions subjected him to double jeopardy. This claim relates to all convictions other than the convictions for first degree sexual assault and for intentional abuse of a vulnerable adult that were alleged to have occurred on or about May 16, 2018. Bershon generally argues that because each of the offenses was alleged as having occurred between January 1 and December 31 of the respective calendar years from 2006 through 2017 rather than on more specific dates in those years, he did not have enough information to respond to the charges and he risked being punished multiple times for the same offense or offenses. We conclude that because Bershon did not properly raise these objections in the district court, he did not preserve the issues for appeal.

[2,3] We first address Bershon's argument that the information did not provide adequate notice of the charges. Objections to the form or content of an information should be raised by a motion to quash. See, Neb. Rev. Stat. § 29-1808 (Reissue 2016); *State v. Davis*, 310 Neb. 865, 969 N.W.2d 861 (2022). When a defendant enters a plea in a case, he or she waives

objections to all defects in an information that can be reached by a motion to quash, except those defects which are of such a fundamental character as to make the indictment wholly invalid. *State v. Smith*, 294 Neb. 311, 883 N.W.2d 299 (2016). We have stated that defects of a fundamental character are not subject to waiver. See *State v. Davis, supra*. However, in *State v. Meers*, 257 Neb. 398, 403, 598 N.W.2d 435, 439 (1999), the defendant attempted to raise a challenge on appeal to an information charging an offense within a 16-month period as being "impermissibly broad in that it fails to inform [the defendant] with reasonable certainty of the crimes charged," and we determined that the challenge was waived for appeal because the defendant failed to file a motion to quash the information on that basis. In this case, although Bershon filed a motion to quash certain charges in the original information filed against him, the issues he raised in that motion did not include the argument he attempts to make on appeal that he did not have adequate notice of the charges related to the years 2006 through 2017. Because Bershon did not move to quash those charges on the basis of inadequate notice that he now asserts on appeal, he has waived the argument on appeal.

[4] Bershon also argues that the 17 convictions violate his constitutional right against double jeopardy. A constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal. *State v. Reinhart*, 283 Neb. 710, 811 N.W.2d 258 (2012). In *Reinhart*, we concluded that because the defendant failed to raise the issue in the trial court, he had waived his double jeopardy claim and we did not address it. Bershon argues that he could not raise the double jeopardy issues in a motion to quash, because the violation would not be apparent until it was known what evidence the State would present at trial. He argues that the alleged double jeopardy violation became apparent only after the State's evidence failed to show specific dates to support each of the 17 convictions.

We note, however, that even after the State's evidence was presented, Bershon did not raise the double jeopardy arguments in the district court. Bershon filed a motion for directed verdict at the close of the State's evidence, and he renewed the motion after he rested his case. However, Bershon's arguments for directed verdict related to the sufficiency of the evidence and he made no argument to the district court regarding double jeopardy. Bershon also did not raise double jeopardy issues after he was found guilty of all counts, and he did not raise double jeopardy objections upon being sentenced for the convictions.

We need not determine the precise point at which it would have been appropriate for Bershon to raise his double jeopardy arguments to the district court, because Bershon did not present them to the district court at any point. Bershon therefore waived the double jeopardy issues for appeal.

We conclude that Bershon waived his arguments that 17 convictions violated due process and double jeopardy, and we therefore reject his first assignment of error.

*There Was Sufficient Evidence to Support Bershon's Convictions for First Degree Sexual Assault.*

Bershon next contends that there was not sufficient evidence to support his 13 convictions for first degree sexual assault. He argues the evidence did not show that B.B. was incapable of consenting to sexual conduct or that any sexual conduct with Bershon was without her consent. Because we determine that the evidence was sufficient to support the convictions, we reject this argument.

Bershon was convicted of first degree sexual assault under § 28-319, which provides in relevant part that one commits first degree sexual assault if one "subjects another person to sexual penetration (a) without the consent of the victim, [or] (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the

nature of his or her conduct." The State charged Bershon under both the "without consent" and "mentally incapable of resisting" versions of first degree sexual assault, and the district court instructed on both.

We note first that in connection with his argument regarding double jeopardy previously considered, Bershon argued that the evidence presented by the State failed to show that sexual abuse occurred in each of the calendar years from 2006 through 2017. Bershon does not repeat this argument in connection with his claim that there was not sufficient evidence to support his convictions for first degree sexual assault. However, we note the following exchange during B.B.'s direct testimony, which followed her testimony regarding incidents in which Bershon subjected her to sexual penetration:

> Q. Okay. And this happened — Is it fair to say that this happened starting in Blair when you lived in that house, when you started high school, it happened throughout the years from 2006 to 2018?
>
> A. Yes.
>
> Q. Okay. And you said it happened a lot, correct?
>
> A. Yes.
>
> Q. Do you think it happened every year that you lived in that house?
>
> A. Yes.

Despite this overarching evidence, Bershon highlights inconsistencies in B.B.'s testimony. He notes that she gave different definitions of what she considered "a lot" and that on cross-examination, when she was asked specific questions as to whether an incident occurred in each year from 2006 through 2017, she responded that she did not remember. We acknowledge these inconsistencies in B.B.'s testimony, but as set forth above, B.B. testified that the sexual conduct occurred "throughout the years from 2006 to 2018" and that "it happened every year." Thus, there was evidence from which the jury could find that sexual conduct occurred in each year from

2006 through 2018, and any inconsistency goes to the credibility of B.B.'s testimony.

In reviewing a criminal conviction, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022). We therefore determine that there was sufficient evidence from which the jury could find that sexual conduct occurred in each of the years charged.

The focus of Bershon's argument on appeal, however, is that the evidence was not sufficient, because there was not sufficient evidence that B.B. was mentally incapable of resisting or appraising the nature of her conduct or that she expressed a lack of consent in an observable manner. Bershon cites portions of B.B.'s testimony in which she appears to indicate that she was aware of what sexual activity was and that she was aware that she could have resisted his conduct. He also argues that although there was evidence that B.B. had intellectual and learning disabilities, such evidence did not support the specific finding that she was incapable of resisting or appraising the nature of her conduct. He also argues there was not sufficient evidence to establish that he subjected B.B. to sexual penetration without her consent; he argues there was no evidence that he used force or the threat of force or that B.B. observably expressed a lack of consent.

[5] In this case, the State charged first degree sexual assault under § 28-319 under both subsection (a) as being "without the consent of the victim" and subsection (b) regarding an actor "who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct." We have stated that when a defendant is charged in alternative ways with committing an offense, the jury can convict if it finds there is sufficient evidence of

either alternative, and thus the judgment of conviction must be affirmed if the evidence is sufficient to support either of the State's alternative theories of guilt. *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018). In *McCurdy*, as in the present case, the defendant was charged under § 28-319 based alternatively on subsection (a) and subsection (b). Therefore, in the present case, as in *McCurdy*, Bershon's convictions should be affirmed if there is sufficient evidence that sexual penetration was without B.B.'s consent, whether or not there was also sufficient evidence that B.B. was mentally incapable of resisting or appraising the nature of her conduct.

With regard to whether sexual penetration was "without consent," Bershon argues that there was no evidence he used physical force or the threat of force against B.B. and that there was no evidence that B.B. ever expressed a lack of consent through words or actions. However, as we determined in *McCurdy, supra*, a lack of consent can be proved when it is shown that the defendant compelled the victim to submit due to the use of coercion, as distinct from force or the threat of force. We noted in *McCurdy* that "[w]ithout consent" is defined in Neb. Rev. Stat. § 28-318(8)(a) (Reissue 2016) to mean that

> (i) [t]he victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor.

In addition to stating that under § 28-318(8)(a)(i), "coercion" was an alternate to "force" and "threat of force," we also determined that "coercion" can be shown to have occurred and shown to have established "without consent" even when it was not shown that the victim actively resisted at the moment relevant to the charge of first degree sexual assault.

[6] In *State v. McCurdy, supra*, we held that "'coercion' in § 28-318(8)(a)(i) includes nonphysical force." 301 Neb. at 358,

918 N.W.2d at 302. In concluding in *McCurdy* that the evidence was sufficient to show that the defendant compelled the victim to submit to sexual penetration by use of coercion and that, therefore, the sexual acts were without consent, we noted evidence regarding a history of the defendant's sexual abuse of the victim, "as well as evidence regarding [the defendant's] position of authority and dominion within [the victim's] life and household." 301 Neb. at 358, 918 N.W.2d at 302. We therefore stated that "under a totality of the circumstances analysis, coercion within the context of a family or household relationship between a minor and an adult authority figure can support a finding that a defendant compelled a victim to submit to sexual penetration by the use of 'coercion.'" *Id.* at 363, 918 N.W.2d at 305.

Similar to *McCurdy*, the evidence in this case indicated that Bershon subjected B.B. to sexual penetration over a period of several years within the context of a family and household relationship, beginning when B.B. was a minor and Bershon was an adult authority figure. Bershon was B.B.'s stepfather, and they lived in the same household during the years the activity occurred. B.B.'s testimony indicated that the sexual activity continued throughout the years and that it started in 2006, when she was 15 or 16 years old. The activity continued thereafter, and Bershon was charged with counts that occurred after B.B. was no longer a minor. However, there was extensive evidence regarding B.B.'s intellectual disability, including B.B.'s own testimony, which allowed the jury to observe for itself the level of her intellectual functioning. We note also Leman's testimony describing B.B. as having "an eight- or nine-year old mentality in a young woman's body" and the school psychologist's testimony that B.B.'s "academic skills would have been for the most part clustered at later elementary, fourth through sixth grade."

Although several counts charged offenses that occurred in years when B.B. was no longer a minor and was well into her twenties, for purposes of determining whether Bershon used

coercion, the jury could have found based on the evidence that B.B.'s immature mentality was similar to that of a minor, and therefore the evidence of the dynamics of the familial and household relationship between Bershon and B.B. could support a finding Bershon compelled B.B. to submit to sexual penetration by the use of coercion.

In addition to evidence of ongoing sexual conduct over several years in the context of a stepparent-stepchild relationship in which Bershon was an adult authority figure in B.B.'s household, we further note B.B. testified that she did not want to engage in sexual conduct with Bershon but that she was afraid of the consequences if she did not comply. She testified that she was afraid that her failure to comply could cause arguments between Bershon and Leman and that they might divorce. We determine the evidence was sufficient to establish that with regard to all 13 charges of first degree sexual assault, Bershon compelled B.B. to submit to sexual penetration due to the use of coercion, and that therefore, the sexual penetration was without B.B.'s consent.

Given the foregoing discussion, there was sufficient evidence to support Bershon's 13 convictions for first degree sexual assault. We reject Bershon's claim to the contrary.

*There Was Sufficient Evidence to Support
Bershon's Convictions for Intentional
Abuse of a Vulnerable Adult.*

Bershon finally claims that there was not sufficient evidence to support his convictions for intentional abuse of a vulnerable adult. He argues that the evidence does not show that B.B. was "sexually abused." We determine that the evidence was sufficient to support the vulnerable adult convictions.

Bershon was convicted of intentional abuse of a vulnerable adult in violation of § 28-386, which provides in relevant part that a "person commits knowing and intentional abuse . . . of a vulnerable adult . . . if he or she through a knowing and intentional act causes or permits a vulnerable adult . . . to be:

(a) Physically injured; [or] (c) Sexually abused." For purposes of § 28-386, "[v]ulnerable adult" is defined in Neb. Rev. Stat. § 28-371 (Reissue 2016) to include, inter alia, "any person eighteen years of age or older who has a substantial mental . . . impairment," and Neb. Rev. Stat. § 28-369 (Reissue 2016) defines "[s]ubstantial mental impairment" as "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, or ability to live independently or provide self-care as revealed by observation, diagnosis, investigation, or evaluation." In addition, "[s]exual abuse" is defined in Neb. Rev. Stat. § 28-367 (Reissue 2016) to "include sexual assault as described in section 28-319 or 28-320 and incest as described in section 28-703."

Bershon does not explicitly contend that there was not sufficient evidence that B.B. was a "vulnerable adult." In this regard, we note that there was substantial evidence regarding B.B.'s intellectual disability and her inability to live independently; this evidence is sufficient to show a "substantial mental impairment" that grossly impaired her ability to live independently.

Bershon's contention instead is that there was insufficient evidence that B.B. was "sexually abused." His argument with regard to these vulnerable adult charges is similar to the arguments he made with regard to the convictions for first degree sexual assault. Because "sexual abuse" for purposes of the offense of intentional abuse of a vulnerable adult is defined to include, inter alia, first degree sexual assault as described in § 28-319, the question whether there is sufficient evidence that B.B. was sexually abused coincides with the question whether there was sufficient evidence of first degree sexual assault under § 28-319. We determined above that there was sufficient evidence for the jury to find that Bershon committed first degree sexual assault with regard to all 13 counts, including those counts related to the years for which the 3 counts of intentional abuse of a vulnerable adult were charged. The same evidence which supported a finding that

Bershon committed first degree sexual assault also supports a finding that B.B. was "sexually abused" and that Bershon's knowing and intentional acts caused or permitted B.B. to be sexually abused.

We conclude that there was sufficient evidence to support Bershon's convictions for intentional abuse of a vulnerable adult, and we reject Bershon's claim to the contrary.

## CONCLUSION

We conclude that because Bershon failed to raise due process and double jeopardy issues in the district court, he waived those issues for appeal. We determine that there was sufficient evidence to support Bershon's convictions for first degree sexual assault and for intentional abuse of a vulnerable adult. We therefore affirm Bershon's convictions and sentences.

Affirmed.