IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BLACKHAWK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

RYAN J. BLACKHAWK, APPELLANT.

Filed February 20, 2024.    No. A-23-501.

Appeal from the District Court for Lancaster County: JODI L. NELSON, Judge. Affirmed.

Kristi J. Egger, Lancaster County Public Defender, and Sarah J. Safarik for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Ryan J. Blackhawk appeals his seven convictions and sentences in the Lancaster County District Court, alleging that the evidence was insufficient to convict him of the charges, his sentences are excessive, and his trial counsel provided ineffective assistance. Based on the reasons that follow, we affirm.

## II. BACKGROUND

On January 11, 2023, Blackhawk was charged by information in the district court with seven counts, including: two counts of assault by strangulation, third degree domestic assault, third degree assault, first degree criminal trespass, criminal mischief (more than $500 but less than $1,500), and resisting arrest. The first count of assault by strangulation and the third degree assault charge alleged that Rebecca Faustino was the victim. The second count of assault by strangulation and the third degree domestic assault charge alleged that Angel Lyons was the victim.

- 1 -

Blackhawk waived his right to a jury trial and a bench trial was held on May 19, 2023. Prior to the start of the trial, a discussion took place regarding a plea offer the State had made and Blackhawk rejected.

The evidence at trial showed that Faustino and Lyons were friends and on August 21, 2022, Lyons came to stay with Faustino at her apartment for a few days. At some point, Lyons asked Faustino if Blackhawk could also stay at Faustino's apartment and Faustino agreed. Lyons and Blackhawk were in a relationship and had six children together.

On August 25, 2022, Faustino, Lyons, and Blackhawk went shopping and Faustino and Lyons went to a nail salon. During this time, the three of them were drinking alcohol. They returned to Faustino's apartment later in the day. Faustino was in her bedroom and Lyons and Blackhawk were in the living room when Faustino heard a loud noise. Faustino testified that she came out of her bedroom and saw Lyons laying back in the recliner with Blackhawk on top of her with his hands around her neck. Blackhawk was choking her and also punching her. Faustino testified Lyons was crying and could not breathe; she was also making a "gurgle" noise and could not scream. Faustino testified that she thought Blackhawk was going to kill Lyons. Faustino reacted by jumping on Blackhawk and pushing him off Lyons. Lyons began "crying and gasping," "choking," and "coughing."

After Faustino jumped on Blackhawk, Blackhawk started hitting her in the jaw and chest while she was on the floor. When she was able to stand up Blackhawk pushed her into a wall, and she hit the back of her head, cracking the drywall. He also punched her and kicked her. She fell to the floor, lying on her back. Blackhawk got on top of her and wrapped both hands around her neck. Faustino testified that she was in pain and could not breathe, and she felt like she was going to pass out. She also testified that her heart was beating fast, and she felt pressure in her eyes. She was able to get away and called the police, as well as her friend Laura Nunez. Blackhawk saw Faustino calling for help and locked himself in the bathroom.

Nunez arrived at the apartment within minutes. She and Faustino kicked the bathroom door down and removed Blackhawk from the apartment. They locked the door and called the police.

While they were waiting for the police to arrive, Blackhawk crashed through the window of Faustino's ground level apartment. He landed on top of Faustino and started hitting her. The police arrived shortly after Blackhawk came through the window.

Nunez testified about what happened after she arrived at Faustino's apartment, and it was generally in agreement with Faustino's testimony. She testified, however, that Blackhawk was in one of the bedrooms when she first entered the apartment and when he came out, he was aggressive and intoxicated. He slapped Lyons and then locked himself in the bathroom. Nunez testified she kicked the door open and got Blackhawk to leave the apartment. Moments later he jumped through the window into the apartment.

Faustino described Lyons' injuries following the incident and pictures of Lyons taken shortly after the incident were entered into evidence. Faustino testified that Lyons' hair had been pulled and "ripped out," her lip was swollen, and her gums were bleeding. Faustino further testified that Lyons had a hickey on her neck prior to the incident, but there were other red marks on her neck and bruising on her chin that was not there before Blackhawk strangled her. She also had a bruise on her cheek and her earring was ripped out of her ear.

Faustino also described her own injuries from the incident and pictures taken shortly after the incident were entered into evidence. She testified that she had red marks on her ribs, chest, and back from being punched and kicked, and a bump on her head from Blackhawk pushing her into the wall. She also had red marks on her neck from Blackhawk choking her. She further testified that she had red marks on her forehead, nose, and chest from the broken glass that hit her when Blackhawk broke the window.

Several days after the incident Faustino realized she had a cracked tooth. She also had continuing pain from Blackhawk choking her, especially when swallowing. Lincoln police officers took pictures of her several days after the incident which were entered into evidence. The pictures showed bruising on her breasts, chest, neck, arm, and legs.

Sergeant Wendi Ground with the Lincoln Police Department was one of the officers that responded to the call on August 25, 2022. She testified about the injuries to Lyons that she observed. She saw a red mark near her left ear, her upper lip was swollen, she had red marks on her neck in addition to the hickeys that she had before the assault, and an injury on her cheek.

Lincoln Police Officer Morgan Dirks was the first officer to arrive at Faustino's apartment on August 25, 2022. When she went inside the apartment building, she encountered Blackhawk just outside the door to Faustino's apartment. He was stumbling around and seemed intoxicated. He would not answer her questions and was noncompliant with what she was asking him to do, such as taking his hands out of his pockets. Blackhawk then tried to go back into the apartment and Dirks grabbed onto him to prevent him from going inside. He tried to pull away from her and was trying to talk to two people in the doorway of the apartment. He stated, "I'll fuck you up" and "should I fuck this bitch up." Dirks believed that the comments were directed at someone inside the apartment. Dirks tried to put Blackhawk in handcuffs, and he continued to pull away from her. She eventually placed him in handcuffs and got him to sit down on the ground. Another officer arrived to help her walk him out of the apartment building. Blackhawk was uncooperative and continued to pull away and argued with the officers, and they had to lift him by the arms to remove him from the building. When they got to the police cruiser, Blackhawk tried to headbutt the second officer, but failed. He continued to be uncooperative when they put him in the cruiser.

After Blackhawk was in the cruiser, Dirks went back to the apartment and spoke with Faustino. She stated that Faustino was "incredibly upset" and "looked absolutely terrified." Her injuries at that time included bruises, swelling, and red marks on her face, chest, and arm. Her neck was red, and she had a cut near her eye.

Faustino was asked about the damages Blackhawk caused and she testified that in addition to the window he broke and the crack in the wall from where she hit her head, Blackhawk also punched her television, punched her closet door, and caused a cabinet to split. She testified that it cost her about $1,800 to fix the damage caused by Blackhawk.

After the State rested its case-in-chief, Blackhawk testified in his own defense. He denied having any physical altercation with either Lyons or Faustino but admitted that he slapped Lyons. He denied breaking the window and denied causing any damage to Faustino's apartment. He also did not remember being in the bathroom and the door being kicked in. He testified that his alcohol consumption on the day in question "possibly" impaired his memory as to what happened.

Regarding his living arrangements, Blackhawk testified that Faustino had let him move in. He stated that Lyons had asked Faustino if he could move in and on August 22, 2022, he moved into the apartment where he and Lyons shared the guest room.

At the conclusion of the trial, the trial court found Blackhawk guilty on all seven counts in the information. It ordered a presentence investigation and scheduled sentencing.

Blackhawk was sentenced in June 2023. The trial court imposed the following sentences: count I, assault by strangulation, a Class IIIA felony, 2 years' imprisonment and 9 months' post-release supervision; count II, assault by strangulation, a Class IIIA felony, 2 years' imprisonment and 9 months' post-release supervision; count III, third degree domestic assault, a Class I misdemeanor, 1 year imprisonment; count IV, third degree assault, a Class I misdemeanor, 1 year imprisonment; count V, first degree criminal trespass, a Class I misdemeanor, 1 year imprisonment; count VI, criminal mischief (more than $500 but less than $1,500), a Class II misdemeanor, 6 months' imprisonment; and count VII, resisting arrest, a Class I misdemeanor, 1 year imprisonment. The court ordered count II to run consecutive to count I; counts III, V, and VI to run concurrent to count I; count IV concurrent to count II; and count VII consecutive to count II. This resulted in a term of 5 years' imprisonment followed by 18 months' post-release supervision.

## III. ASSIGNMENTS OF ERROR

Restated, Blackhawk assigns that the trial court erred in (1) finding that the evidence was sufficient to convict him on all seven charges and (2) imposing excessive sentences. Blackhawk also assigns that he received ineffective assistance of counsel in that his "[t]rial counsel failed to consult with [him] on a regular basis in-person about the charges in the Information preventing [him] from fully discussing the plea offer made and the risk of going to trial as opposed to accepting a plea offer."

## IV. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Bershon*, 313 Neb. 153, 983 N.W.2d 490 (2023).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Abligo*, 312 Neb. 74, 978 N.W.2d 42 (2022).

Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether

the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Blackhawk first assigns that there was insufficient evidence to convict him on any of the seven counts. We conclude that there was sufficient evidence to support the convictions. Each charge is discussed separately below.

### (a) Count I

The first charge against Blackhawk was assault by strangulation against Faustino. Blackhawk argues the evidence was insufficient because "[t]he only evidence to support Count I comes from . . . Faustino." Brief for appellant at 22-23. This argument goes only to the weight and credibility given to Faustino's testimony by the trial court as the finder of fact, and not to any of the elements of the crime. As stated above, in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Bershon, supra.* The trial court apparently found Faustino's testimony credible, and we do not question the court's reliance on her testimony.

The evidence here, when viewed and construed most favorably to the State, is sufficient to support Blackhawk's conviction for assault by strangulation involving Faustino. Assault by strangulation in violation of Neb. Rev. Stat. § 28-310.01 (Cum. Supp. 2022), provides:

(1) A person commits the offense of assault by strangulation or suffocation if the person knowingly and intentionally:

(a) Impedes the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck of the other person; or

(b) Impedes the normal breathing of another person by covering the mouth and nose of the person.

(2) An offense is committed under this section regardless of whether a visible injury resulted.

Faustino testified that after Blackhawk pushed her into the wall, she fell and was lying on her back. Blackhawk got on top of her and wrapped both hands around her neck. Faustino testified that while Blackhawk had his hands around her neck she was in pain and could not breathe, and she felt like she was going to lose consciousness. She also testified that her heart was beating fast, and she felt pressure in her eyes. Further, although visible injuries are not required to prove assault by strangulation, Faustino had red marks on her neck immediately following the incident. Several days after the incident she continued to have pain when swallowing and had bruising on her neck.

We conclude that the evidence admitted at trial was sufficient to support Blackhawk's conviction on count I, assault by strangulation against Faustino.

## (b) Count II

The second charge against Blackhawk was assault by strangulation against Lyons. Blackhawk argues that the evidence was insufficient because "[t]he States [sic] only evidence is the testimony of . . . Faustino, who was not able to confirm that . . . Lyons was not able to breath [sic]." Brief for appellant at 23. This argument again challenges the credibility of Faustino's testimony and fails because just like in count I, the trial court implicitly found Faustino's testimony to be credible.

Faustino testified that she witnessed Blackhawk on top of Lyons in the recliner, with his hands around her neck, choking her. Faustino further testified that Lyons was crying and could not breathe. She was also making a "gurgle" noise and could not scream. Based on what she observed, Faustino thought Blackhawk was going to kill Lyons. When Blackhawk was no longer on top of Lyons, she began crying, gasping, choking, and coughing.

Faustino also testified about Lyons' injuries following the incident. She testified that Lyons had red marks on her neck that were not there before Blackhawk strangled her. Ground also testified that Lyons had red marks on her neck that did not look like they were from hickeys.

The evidence here, when viewed and construed most favorably to the State, supports Blackhawk's conviction for count II, assault by strangulation against Lyons.

## (c) Count III

Blackhawk next alleges that the evidence adduced at trial was insufficient to convict him of count III, third degree domestic assault of Lyons. Neb. Rev. Stat. § 28-323 (Reissue 2016) provides: "(1) A person commits the offense of domestic assault in the third degree if he or she: (a) Intentionally and knowingly causes bodily injury to his or her intimate partner; (b) Threatens an intimate partner with imminent bodily injury; or (c) Threatens an intimate partner in a menacing manner." Blackhawk argues that the evidence was insufficient because "[t]he State failed to prove bodily injury to . . . Lyons." Brief for appellant at 24. We disagree.

The evidence shows that Lyons was injured. Faustino testified that Lyons' hair had been pulled and "ripped out," her lip was swollen, and her gums were bleeding. She had bruising on her chin and cheek, and her earring was ripped out of her ear. As previously discussed, Lyons also had red marks on her neck that were not present before the incident. In addition, Ground testified Lyons had a red mark near her left ear, a swollen upper lip, and an injury on her cheek.

We conclude there was sufficient evidence to support Blackhawk's conviction for count III, third degree domestic assault of Lyons.

## (d) Count IV

Blackhawk next alleges that the evidence was insufficient to convict him of count IV, third degree assault against Faustino. He argues the evidence is insufficient because "[a]gain, the State's main evidence that this assault occurred is from the testimony of . . . Faustino herself" and "[he] denied any physical altercation between himself and . . . Faustino." Brief for appellant at 24. This argument fails because again it challenges the credibility of witnesses' testimony. The trial court apparently found Faustino's testimony credible and Blackhawk's testimony not credible. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or

reweigh the evidence; such matters are for the finder of fact. See *State v. Bershon*, 313 Neb. 153, 983 N.W.2d 490 (2023).

Pursuant to Neb. Rev. Stat. § 28-310 (Reissue 2022), "(1) A person commits the offense of assault in the third degree if he: (a) Intentionally, knowingly, or recklessly causes bodily injury to another person." Faustino testified that when Blackhawk had her hands around her neck she was in pain and could not breathe. She testified that after the incident she had red marks on her ribs, chest, and back from being punched and kicked, a bump on her head from being pushed into the wall, and red marks on her forehead, nose, and chest from the broken glass. She also had red marks on her neck from Blackhawk choking her. Several days after the incident Faustino realized she had a cracked tooth. She also had continuing pain from Blackhawk choking her. The pictures entered into evidence showed bruising on her breasts, chest, neck, arm, and legs.

Dirks also testified that after the incident Faustino had bruises, swelling, and red marks on her face, chest, and arm. Her neck was red, and she had a cut near her eye.

There was sufficient evidence to meet the elements of third degree assault and support Blackhawk's conviction on count IV.

(e) Count V

Blackhawk alleges that the evidence at trial was insufficient to convict him of count V, first degree criminal trespass. A person commits first degree criminal trespass if "[h]e or she enters or secretly remains in any building or occupied structure, or any separately secured or occupied portion thereof, knowing that he or she is not licensed or privileged to do so." Neb. Rev. Stat. § 28-520 (Reissue 2016).

Blackhawk claims the State failed to prove beyond a reasonable doubt that "[he] knew he was not licensed or privileged to enter the apartment." Brief for appellant at 25. He argues that the evidence showed that he was living at Faustino's apartment with her approval on August 25, 2022, the day the incident took place. Therefore, he contends there is no evidence he knew he was not licensed or privileged to be in the apartment.

The plain language of "knowing" in subdivision (1)(a) of § 28-520, in the context of entering any building or occupied structure "knowing that he or she is not licensed or privileged to do so," imposes a subjective standard focused on the accused's actual knowledge. *State v. Stanko*, 304 Neb. 675, 687, 936 N.W.2d 353, 363 (2019). "[K]nowledge, like intent, may be inferred from the circumstances surrounding the act." *Id.*

The evidence supports Blackhawk's argument that he had been staying at Faustino's apartment with her approval for a few days prior to the incident. On the day of the incident, he was also initially in the apartment with Faustino's approval. However, the evidence shows during the incident Blackhawk locked himself in the bathroom of Faustino's apartment and Faustino and Nunez kicked down the door and forcibly removed Blackhawk from the apartment. They then locked the door to the apartment and waited for the police to arrive. After having been forcibly removed from the apartment, Blackhawk would have known that he was no longer licensed or privileged to enter the apartment. However, Blackhawk chose to reenter the apartment by crashing through the window.

We conclude that the knowledge element was met and there was sufficient evidence to convict Blackhawk of count V, first degree criminal trespass.

### (f) Count VI

Blackhawk next alleges that the evidence was insufficient to support his conviction on count VI, criminal mischief (more than $500 but less than $1,500). Blackhawk argues the evidence was insufficient because "[he] denied damaging the apartment in any way" and "the State did not make a sufficient showing that the damages were valued between $500-1500, as the only evidence they presented as to the damage amount was through the testimony of . . . Faustino without any receipts." Brief for appellant at 26.

Pursuant to Neb. Rev. Stat. § 28-519 (Reissue 2016):

(1) A person commits criminal mischief if he or she:

(a) Damages property of another intentionally or recklessly; or

(b) Intentionally tampers with property of another so as to endanger person or property;

. . .

(4) Criminal mischief is a Class II misdemeanor if the actor intentionally or maliciously causes pecuniary loss of five hundred dollars or more but less than one thousand five hundred dollars.

Faustino testified regarding the damage caused by Blackhawk. She testified that he broke the window and damaged the wall when he pushed her into it. He also damaged her television, a closet door, and a cabinet. As a result of Blackhawk's actions, Faustino had to pay $1,800 in damages to her landlord, with $900 coming from her security deposit and the other $900 out of pocket. Blackhawk's only testimony regarding the damage was his denial that he caused any damage or did not remember causing any damage.

We conclude there was sufficient evidence to find Blackhawk guilty of count VI, criminal mischief (more than $500 but less than $1,500).

### (g) Count VII

Finally, Blackhawk argues that the evidence was insufficient to convict him of count VII, resisting arrest. Pursuant to Neb. Rev. Stat. § 28-904(1)(a) (Reissue 2016), a person commits the offense of resisting arrest if he or she uses or threatens physical force or violence against a peace officer while intentionally preventing or attempting to prevent the peace officer from effecting an arrest of the actor or another. The elements of resisting arrest are met here.

Dirks testified that when she first approached Blackhawk in the apartment building, he would not answer her questions and was noncompliant with her directives. When Blackhawk tried to go back into the apartment, Dirks grabbed onto him to prevent him from going inside and he tried to pull away from her. When she tried to put Blackhawk in handcuffs, he continued to pull away from her and she struggled with him. After Dirks succeeded in placing him in handcuffs and she and the other officer were walking Blackhawk out of the apartment building, Blackhawk continued to be uncooperative and continued to pull away from them. They had to pick him up by his arms to get him out of the building. Dirks testified that when they got to the police cruiser, Blackhawk attempted to headbutt the second officer, but failed. Viewing the evidence in a light most favorable to the State, we find the evidence indicates that Blackhawk engaged the police

officers in a physical altercation by resisting Dirks' attempts to gain control and then attempting to headbutt the second officer.

Blackhawk contends that the evidence is unclear at what point he knew he was under arrest. An arrest is taking custody of another person for the purpose of holding or detaining him or her to answer a criminal charge, and to effect an arrest, there must be actual or constructive seizure or detention of the person arrested. *State v. Heath*, 21 Neb. App. 141, 838 N.W.2d 4 (2013). Verbal advisement of an attempted arrest is not required; it is enough that the officer has begun to take actions to effectuate physical control over the defendant. See *id.* Even if there was not a definitive point at which Blackhawk was under arrest, he would have known he was under arrest when he tried to headbutt the officer as he was in handcuffs at that time.

We, therefore, find that the evidence presented at trial, viewed in the light most favorable to the State, is such that a reasonable trier of fact could have found Blackhawk guilty of count VII, resisting arrest.

## 2. EXCESSIVE SENTENCES

Blackhawk next assigns that the sentences imposed by the trial court are excessive and constitute an abuse of discretion. He contends that the trial court failed to properly weigh his minimal criminal history as well as other factors and circumstances in his life, such as how imprisonment will be a hardship on his dependents, that he has a strong support system, and that he has a 12th grade education and employment history.

We first consider whether Blackhawk's sentences are within the statutory range. Counts I and II are Class IIIA felonies punishable by up to 3 years' imprisonment and 18 months' post-release supervision, and a minimum term of 9 months' post-release supervision if imprisonment is imposed. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022). The court sentenced Blackhawk to a term of 2 years' imprisonment and 9 months' post-release supervision on both counts I and II. Counts III, IV, V, and VII are Class I misdemeanors punishable by up to 1 year imprisonment. See Neb. Rev. Stat. § 28-106 (Reissue 2016). The court sentenced Blackhawk to 1 year imprisonment on each of the four Class I misdemeanor convictions. Count VI is a Class II misdemeanor punishable by up to 6 months' imprisonment. See § 28-106. The court sentenced Blackhawk to 6 months' imprisonment on count VI. Blackhawk's sentences are within the statutory range; as such, we review the court's sentencing determination only for an abuse of discretion.

In reviewing whether an abuse of discretion occurred during sentencing, an appellate court determines whether the sentencing court considered and applied the relevant factors and any applicable legal principles in determining the sentence to be imposed. *State v. Starks*, 308 Neb. 527, 955 N.W.2d 313 (2021). Relevant factors in that analysis may include the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.*

While these factors should instruct a sentencing court, they do not comprise a mathematical formula that must be rigidly implemented. *Id.* Rather, they are among the relevant factors that may be considered. *Id.* A sentence should be tailored and based on factors that fit the offender and not

merely the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observation of the defendant's demeanor and attitude and of all the facts and circumstances surrounding the defendant's life. *Id.*

At the sentencing hearing, the court stated that it had considered the presentence investigation, the nature and circumstances of the crimes, and Blackhawk's history, character, and condition.

The evidence showed that Blackhawk was 35 years old at the time of sentencing. His criminal history includes two convictions for driving without an operator's license, obstructing a peace officer, three convictions for minor in possession of alcohol, delivery or intent to deliver a controlled substance, and operating a vehicle while intoxicated-second offense in Iowa. On the Level of Service/Case Management Inventory assessment, Blackhawk scored in the high-risk category to reoffend. Blackhawk scored in the medium high-risk range on the Domestic Violence Offender Matrix, indicating that abuse will likely continue and possibly escalate in severity and frequency.

The trial court relied upon the appropriate factors in fashioning Blackhawk's sentences and there is nothing in the record to suggest that it relied on irrelevant or inappropriate considerations. It is not this court's function to conduct a de novo review and a reweighing of the sentencing factors in the record. See *State v. Starks, supra.* Instead, it is enough for us to conclude that the trial court's reasons for Blackhawk's sentences are not clearly untenable and do not unfairly deprive him of a substantial right and just result. *Id.* We find no abuse of discretion by the trial court in sentencing Blackhawk. This assignment of error fails.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Blackhawk's final assignment of error is that he received ineffective assistance of counsel in that his "[t]rial counsel failed to consult with [him] on a regular basis in-person about the charges in the Information[,] preventing [him] from fully discussing the plea offer made and the risk of going to trial as opposed to accepting a plea offer."

When a defendant's trial counsel is different from his or her counsel on direct appeal, as is the case here, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. See *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Miranda, supra.* To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice under the prejudice component of *Strickland*, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Miranda, supra.*

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination

of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id*. When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.*

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

Blackhawk contends that the record is insufficient to resolve his claim on direct appeal. We disagree. Blackhawk's ineffective assistance of counsel claim involves the communication with his counsel regarding the plea offer. Before the bench trial began on May 19, 2023, the court asked if there were any pretrial matters. The State indicated that it wanted the plea that was offered to Blackhawk on the record. The State set forth the conditions of the plea that had been offered to Blackhawk, stating that the plea had been available until 2 p.m. the day before trial, and Blackhawk declined the offer.

Blackhawk's counsel then indicated that he received the plea offer from the State and went to the jail on May 17, 2023, 2 days before trial, to discuss the plea offer with Blackhawk. Blackhawk told counsel he did not want to accept the offer. Blackhawk's counsel stated that he left the offer open and called Blackhawk the next day, the day before trial, to ask him again about the plea offer. After the call, Blackhawk wanted to think about the offer. Within 30 minutes after Blackhawk and his counsel spoke on the telephone, Blackhawk contacted his counsel's office and indicated he was not accepting the offer.

Blackhawk agreed at trial with his counsel's account of what took place regarding the plea offer. The court then specifically asked Blackhawk if he was aware that an offer had been made and that it would expire at 2 p.m. the day before trial. The court also asked him if he had rejected the plea offer. Blackhawk responded "yes" to both questions.

We conclude that the record refutes Blackhawk's allegation that trial counsel was ineffective, as trial counsel met with Blackhawk in person to discuss the plea offer and then talked with him on the telephone before the plea offer expired. The record establishes that trial counsel's performance was not deficient and, therefore, Blackhawk's final assignment of error fails.

## VI. CONCLUSION

For the reasons set forth above, we affirm Blackhawk's convictions and sentences. We further conclude that the record before us is sufficient to address Blackhawk's claim of ineffective assistance of counsel and we find that it fails.

AFFIRMED.