Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/08/2025 09:09 AM CDT

## State of Nebraska, appellee, v.
## Paul D. Bershon, appellant.

___ N.W.3d ___

Filed April 8, 2025.    No. A-24-174.

1. **Postconviction: Constitutional Law: Appeal and Error.** In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.

2. **Postconviction: Appeal and Error.** On appeal from the denial of postconviction relief without an evidentiary hearing, the question is not whether the movant was entitled to relief by having made the requisite showing. Instead, it must be determined whether the allegations were sufficient to grant an evidentiary hearing.

3. **Postconviction: Constitutional Law: Proof.** The district court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the state or federal Constitution.

4. **Postconviction: Pleadings.** The allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified.

5. **Postconviction: Constitutional Law: Proof.** An evidentiary hearing is not required on a motion for postconviction relief when (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief.

6. **Postconviction: Effectiveness of Counsel: Appeal and Error.** Generally, a motion for postconviction relief cannot be used to secure

review of issues that were or could have been litigated on direct appeal; however, when the defendant is represented both at trial and on direct appeal by the same counsel, the defendant's first opportunity to assert ineffective assistance of trial counsel is in a motion for postconviction relief.

7. **Effectiveness of Counsel: Proof.** In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden to show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense in his or her case.

8. **Effectiveness of Counsel: Presumptions: Proof.** The two prongs of the ineffective assistance of counsel test—deficient performance and prejudice—may be addressed in either order, and the entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable.

9. **Effectiveness of Counsel: Proof.** To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

10. ____: ____. To establish prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

11. **Sexual Assault: Witnesses: Evidence: Proof.** Before defense counsel may cross-examine a witness about prior false allegations of sexual assault, a defendant must establish, outside the presence of the jury, and by a greater weight of the evidence, that (1) the accusation or accusations were in fact made, (2) the accusation or accusations were in fact false, and (3) the evidence is more probative than prejudicial. If the defendant satisfies these three conditions, the trial court will authorize cross-examination of the complaining witness concerning the alleged false accusations; the defendant may thereafter present extrinsic evidence of the false accusations only if the complaining witness denies or fails to recall having made such accusations.

12. **Sexual Assault: Witnesses.** In sexual assault cases, the complaining witness' credibility is critical.

13. **Sexual Assault: Witnesses: Evidence.** Prior fabricated accusations of sexual assault are highly probative of a complaining witness' credibility, and in such cases, evidentiary constraints must sometimes yield to a defendant's right of cross-examination.

14. **Effectiveness of Counsel: Trial: Appeal and Error.** In cases where the alleged ineffectiveness of counsel was not raised or ruled on at the trial level, an evaluation of defense counsel's actions would require an evaluation of trial strategy and of matters not contained in the record.

15. ____: ____: ____. It is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal.

16. **Effectiveness of Counsel: Presumptions.** In assessing deficiency in counsel's performance, a court presumes that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

17. **Effectiveness of Counsel.** Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance.

18. **Effectiveness of Counsel: Trial: Presumptions: Appeal and Error.** An appellate court does not use perfect hindsight to criticize unsuccessful trial strategies or second-guess trial strategy; there is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.

19. **Postconviction.** In a motion for postconviction relief, a defendant is required to specifically allege what the testimony of potential witnesses would have been had they had been called at trial in order to avoid dismissal without an evidentiary hearing. Absent specific allegations, a motion for postconviction relief effectively becomes a discovery motion to determine whether evidence favorable to a defendant's position actually exists.

Appeal from the District Court for Washington County: John E. Samson and Bryan C. Meismer, Judges. Affirmed in part, and in part reversed and remanded for further proceedings.

Mark Porto, of Wolf, McDermott, Depue, Sabott, Butz & Porto, L.L.C., and Jerrod Jaeger, of Jaeger Law Office, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

Riedmann, Chief Judge, and Pirtle and Arterburn, Judges.

Arterburn, Judge.

INTRODUCTION

Paul D. Bershon appeals from an order of the district court for Washington County that denied, without an evidentiary hearing, his motion for postconviction relief. We determine

that the district court erred when it denied Bershon an evidentiary hearing on his claim that trial counsel was ineffective for failing to present evidence of a prior recanted accusation of sexual assault made by the victim. We therefore reverse that portion of the district court's order and remand the cause for an evidentiary hearing on this single claim. In all other respects, the order of the district court is affirmed.

## BACKGROUND

A full recitation of the facts underlying Bershon's convictions is not necessary to our review of his postconviction appeal. As such, we summarize only the facts necessary to provide context for the present appeal. A full recitation of the facts underlying Bershon's convictions can be found in his direct appeal in *State v. Bershon*, 313 Neb. 153, 983 N.W.2d 490 (2023).

In 2021, the State charged Bershon in an amended information with 13 counts of first degree sexual assault, Class II felonies; 3 counts of incest, Class III felonies; and 3 counts of intentional abuse of a vulnerable adult, Class IIIA felonies. Bershon pled not guilty to all charges. The charges related to Bershon's sexual abuse of his then-stepdaughter, B.B., which began in 2006 and continued through 2018. B.B. was born in December 1990 and was 15 years old when the alleged abuse began. She is intellectually disabled.

When B.B. was born, her mother, Pamela Leman, was married to B.B.'s biological father. B.B.'s parents divorced a few years later, and Leman married Bershon in 2000. Leman and Bershon had two children together, Joshua B. and Jessica B., born in 2001 and 2002, respectively. In 2005, Leman, Bershon, B.B., Joshua, and Jessica resided in a home in Michigan together. In 2006, the family moved to Nebraska.

Prior to trial, Bershon filed a motion in limine to preclude the State from introducing any evidence of a 2005 sexual assault allegation made by B.B. against him in Michigan (referred to hereafter as the "Michigan allegations"). A hearing was held

on the motion, and the court received as evidence a copy of the 2005 Michigan police report detailing the allegation and the subsequent investigation. The report shows that in August 2005, when B.B. was 14 years old, she reported that Bershon had touched her in a sexual manner. A month after making her initial statement, B.B. recanted the allegation, informed law enforcement that she had lied, and stated that Bershon had never "done anything to her." Consequently, the investigation was closed.

The State objected to Bershon's motion and moved to elicit evidence of the Michigan allegations pursuant to Neb. Rev. Stat. § 27-414 (Reissue 2016). The State specified that it mainly sought inclusion of the Michigan allegations to prevent a mistrial. The State explained that if the allegations were not admissible, there was a significant probability that despite any warnings the State gave B.B., she would inadvertently mention these events during her trial testimony.

The court inquired as to whether Bershon had any additional evidence regarding the alleged recantation. Bershon stated that he did not have any additional evidence. The court then asked whether the police report would be admissible in a § 27-414 hearing. Bershon remarked that it would be admissible because he did not believe that the strict rules of evidence applied to § 27-414 hearings. The court and the State disagreed and stated that they believed that the rules of evidence applied. Bershon's counsel replied, "Judge, what am I—I mean, listen, I'm not in a position where—Am I supposed to fly in this law enforcement officer from Michigan?"

The court subsequently held a § 27-414 hearing. Once again, Bershon offered as evidence the 2005 Michigan police report that the court had received in support of his motion in limine. Bershon argued

> Defense counsel is aware of the extrinsic evidence rule, and the reason I move to admit the police report is because we don't know where the author is, we can't

bring the author in to verify the veracity of the report, but
we know there's an allegation that she lied.

The State objected, arguing that the document contained hearsay. The court sustained the objection.

B.B. and Leman testified about the Michigan allegations at the hearing. B.B. recalled that while living in Michigan, she reported to law enforcement that Bershon had "touched" her. Initially, she could not recall the specifics of her statement, nor the incident that preceded her contacting law enforcement. After the State refreshed B.B.'s recollection, B.B. testified that Bershon had "[t]ouched [her] boob and all that other kind of stuff." The State asked her to clarify what "other . . . stuff" meant, and B.B. testified that Bershon had touched her vagina. B.B. testified that she initially told her biological father of the assault and that afterward, she went to the police station with him. She could not recall if Bershon had touched her more than once. She also could not recall if the touching occurred on bare skin or over her clothes. B.B. denied ever lying to the police about these allegations.

The State also asked B.B. whether Bershon had told her anything when he touched her. B.B. testified that she did not remember. After refreshing her memory with the 2005 police report, the State asked the same question, and B.B. responded, "I don't know." The State then asked, "[D]o you recall if [Bershon] said don't tell anyone or I'll get in trouble," to which B.B. responded, "Oh yes. Yes."

Leman similarly testified that in August 2005, police officers arrived at her Michigan home and informed her that B.B. had told her biological father that Bershon had sexually assaulted her, and her father filed a police report in response. Leman did not recall having any other conversations concerning these allegations with the police, Bershon, or B.B. She also did not recall what she thought of the allegations at the time, nor the results of the police investigation.

After all the evidence was submitted, Bershon argued that the State failed to show that the 2005 assault had actually

occurred. Bershon pointed out that B.B. testified several times that she did not remember the specifics of the allegations. He also argued that in light of her memory lapses, her testimony that she did not lie to the police was unreliable. Additionally, Bershon seriously questioned Leman's testimony that she could not recall any significant details about the sexual assault allegations, considering that they were made by her intellectually disabled daughter against her then-husband. For these reasons, he asked the court to deny the State's motion to introduce this evidence under § 27-414.

On May 4, 2021, the court issued an order finding that "the State did not meet its burden of proof and that the limited probative value, due to lack of details, of [the Michigan allegations] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury." The court stated that "[t]he inability of both [B.B.] and [Leman] to remember any details of the alleged Michigan [allegations] made it impossible for the Court to find that clear and convincing evidence had been shown by the State." The State was precluded from presenting any evidence regarding the Michigan allegations at trial.

Accordingly, at trial, B.B. and Leman testified only about the events that occurred in Nebraska and led to the charges against Bershon. Leman generally testified that in May 2018, she walked into the kitchen and witnessed B.B. performing oral sex on Bershon. When Leman entered the room, B.B. ran out, and Bershon told Leman, "I'm lonely and she wants to." Leman stated that B.B. hid in her bedroom for days afterward, refused to talk, and was extremely frightened. Two days later, Bershon moved out of the home. The following day, Leman contacted law enforcement.

On cross-examination, Leman testified that later that month, Bershon sent her a text message and a voicemail message apologizing and admitting he was at fault for the incident. Leman testified that she did not provide these messages to the police and that they were no longer in her possession.

She explained that the text message was sent to a phone that automatically deleted messages after 30 days and that the voicemail was sent to a home answering machine that eventually stopped working. Leman admitted that she had at least 30 days after receiving the messages to provide them to law enforcement. She did not explain why she did not do so. Leman admitted that she provided law enforcement with other items that she believed were relevant to the case.

B.B. testified that she recalled an incident where she was "sucking on [Bershon's] private" when Leman walked in and Bershon smacked her on the head. She clarified that by "private," she meant penis. B.B. testified that she knew what she was doing was wrong, but she did not know why she had done it. She also testified that she and Bershon had engaged in oral sex approximately 10 times.

B.B. testified that she and Bershon engaged in sexual intercourse "a lot," and when asked what "a lot" meant, she said "[a] hundred times." B.B. testified that the abuse occurred every year she had lived in Nebraska with Bershon. B.B. also testified that the abuse occurred when Leman was not in the home. B.B. testified that it was Bershon's idea to have sex and that she did not refuse him because she feared him. She testified that Bershon told her not to tell Leman about these incidents and that she was scared to tell Leman because she did not want Leman and Bershon to fight or get a divorce. B.B. denied ever telling her siblings about the assaults but confirmed that Leman informed them after she discovered the abuse.

Additionally, a significant amount of evidence was adduced at trial concerning B.B.'s intellectual disability. Bob Richey, a school psychologist who worked with B.B. in high school, testified that B.B. was enrolled in special education courses and an individualized education plan beginning in elementary school. B.B. graduated from high school when she was 21 years old.

In 2007, Richey conducted IQ testing on B.B. and determined that her full scale IQ was 48. Richey testified that at B.B.'s age, the average individual's score was 100, and that a score below 70 indicated the presence of "a mental handicap." B.B.'s score placed her "below the first percentile." Richey testified that B.B.'s academic skills clustered around the late elementary years of fourth through sixth grade. He further testified that in his opinion, B.B. had a substantial mental impairment while in high school.

Elizabeth Morell, a clinical psychologist, conducted a psychological assessment of B.B. in 2018 that involved an IQ test. The test determined that B.B.'s full scale IQ at that point was 63. Morell testified that this score was in the lowest percentile level and "extremely low range." She ultimately diagnosed B.B. with a mild intellectual disability. Morell reached this diagnosis after considering B.B.'s low intellectual functioning, along with B.B.'s low adaptive functioning, which was determined based on B.B.'s inability to manage her day-to-day activities. Morell categorized B.B.'s diagnosis as chronic in nature, meaning that it was unlikely that B.B.'s intellectual functioning would improve over the course of time. Morell concluded that B.B. was not capable of independent living and that she needed continuous help in meeting her daily needs and activities.

B.B., Jessica, and Leman also testified about B.B.'s intellectual disability. B.B. testified that she was in a resource room all throughout high school, that she graduated from high school when she was "[s]omewhere in [her] twenties," and that she had participated in the Special Olympics. B.B also testified that she did not cook for herself and did not operate motor vehicles.

Jessica testified that although B.B. is older than Jessica, she treats B.B. like a younger sister. Jessica explained that she helps take care of B.B. and has a desire to protect B.B. Jessica testified that B.B. does not drive a car because driving

frightens her and that B.B. needs assistance whenever she is purchasing items in a store.

Leman testified that when B.B. entered kindergarten, she was unable to participate and was placed into special education courses. B.B. remained in special education courses and an individualized education plan program until graduating at age 21. Leman testified that B.B. was never diagnosed with a specific intellectual disability but that she described it as "learning disabled" and believed that B.B. would remain at her current level of functioning. Leman described B.B. as having the mentality of an 8- or 9-year-old. Due to B.B.'s intellectual disability, B.B. receives disability payments from the Social Security Administration.

During closing arguments, Bershon asserted that Leman manipulated B.B. to fabricate the allegations against Bershon because her marriage to Bershon was deteriorating and Leman wanted financial security in the event of a divorce. In support of his theory, Bershon emphasized Leman's failure to provide law enforcement with the incriminating text message and voicemail she allegedly received from Bershon. He argued that Leman's decision to turn over other items indicated that she had the knowledge and capability to provide the police with relevant materials. He asserted that these alleged messages were "the most incriminating evidence" against Bershon and that the only logical conclusion for Leman's not providing these messages to law enforcement was that they never existed.

At the conclusion of the trial, Bershon was found guilty by a jury of all charges. The court sentenced him to an aggregate sentence of 80 to 90 years' imprisonment.

In August 2021, Bershon filed a direct appeal and was represented by his trial attorneys. He alleged due process and double jeopardy violations with respect to all charges occurring prior to 2018. He further assigned and argued that there was insufficient evidence to support his 13 convictions for first degree sexual assault and his 3 convictions for intentional

abuse of a vulnerable adult. The Nebraska Supreme Court affirmed his convictions and sentences. See *State v. Bershon*, 313 Neb. 153, 983 N.W.2d 490 (2023).

On January 5, 2024, Bershon, represented by new counsel, filed a motion for postconviction relief. In his motion, Bershon alleged that his trial counsel had provided ineffective assistance of counsel when counsel failed to (1) present evidence of the recanted Michigan allegations, (2) investigate the contents of Bershon's cell phone to definitively show that he did not send incriminating messages to Leman, (3) have B.B. independently evaluated, and (4) call Joshua as a witness at trial. The State objected to Bershon's request for an evidentiary hearing.

On February 22, 2024, the district court issued a three-page order denying Bershon postconviction relief without an evidentiary hearing. The court found that Bershon's four claims of ineffective assistance of trial counsel were "speculative allegations as to whether a different course of action would have altered the outcome of the jury trial." The court determined that Bershon "failed to make any factual allegations that would render the judgment void or voidable" and that Bershon failed to show prejudice.

Bershon now appeals to this court.

## ASSIGNMENT OF ERROR

Bershon assigns that the district court erred in determining that his motion for postconviction relief failed to allege facts that, if proved, constituted an infringement of his constitutional right to effective assistance of counsel.

## STANDARD OF REVIEW

[1] In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Harms*, 315 Neb. 445, 996 N.W.2d 859 (2023).

[2] On appeal from the denial of postconviction relief without an evidentiary hearing, the question is not whether the movant was entitled to relief by having made the requisite showing. Instead, it must be determined whether the allegations were sufficient to grant an evidentiary hearing. *State v. Meyer*, 30 Neb. App. 662, 971 N.W.2d 185 (2022).

## ANALYSIS

[3-5] Bershon challenges the district court's denial of his motion for postconviction relief without first holding an evidentiary hearing on his four ineffective assistance of counsel claims. Before addressing his specific arguments on appeal, we set forth the general principles applicable to postconviction motions. The district court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the state or federal Constitution. *State v. Yates*, 32 Neb. App. 555, 2 N.W.3d 197 (2024). See, also, *State v. Jaeger*, 311 Neb. 69, 970 N.W.2d 751 (2022). However, the allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified. *State v. Yates, supra*. An evidentiary hearing is not required on a motion for postconviction relief when (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief. *Id.*

[6] In his motion for postconviction relief, Bershon asserts four claims of ineffective assistance of trial counsel. Generally, a motion for postconviction relief cannot be used to secure review of issues that were or could have been litigated on direct appeal. See *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022). However, when the defendant is represented both at trial and on direct appeal by the same counsel, as was the

case here, the defendant's first opportunity to assert ineffective assistance of trial counsel is in a motion for postconviction relief. See *id.*

[7-10] In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden, in accordance with *Strickland v. Washingto*n, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense in his or her case. *State v. Munoz*, 309 Neb. 285, 959 N.W.2d 806 (2021). The two prongs of this test—deficient performance and prejudice—may be addressed in either order, and the entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable. *Id.* To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To establish prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *State v. Henderson*, 301 Neb. 633, 920 N.W.2d 246 (2018).

Bershon asserts that trial counsel was ineffective when counsel failed to (1) present evidence of the recanted Michigan allegations, (2) investigate the contents of Bershon's cell phone, (3) have B.B. independently evaluated, and (4) call Joshua as a witness at trial. We review each of these claims separately.

*Failure to Offer Evidence of Michigan Allegations.*

Bershon argues that trial counsel was ineffective because counsel failed to present evidence that B.B. had recanted the Michigan allegations. Bershon maintains that if this evidence had been used to impugn the credibility of both B.B. and Leman, there is a reasonable probability that a different outcome would have resulted at trial. The State counters that this claim was properly denied without an evidentiary hearing because Bershon cannot show deficient performance or prejudice.

[11] We begin with an overview of our case law on prior false allegations of sexual assault. Before defense counsel may cross-examine a witness about prior false allegations of sexual assault, a defendant must establish, outside the presence of the jury, and by a greater weight of the evidence, that

> (1) the accusation or accusations were in fact made, (2) the accusation or accusations were in fact false, and (3) the evidence is more probative than prejudicial. If the defendant satisfies these three conditions, the trial court will authorize cross-examination of the complaining witness concerning the alleged false accusations. The defendant may thereafter present extrinsic evidence of the false accusations only if the complaining witness denies or fails to recall having made such accusations.

*State v. Swindle*, 300 Neb. 734, 752, 915 N.W.2d 795, 810 (2018). See, also, *State v. Ali*, 312 Neb. 975, 981 N.W.2d 821 (2022).

[12,13] The Supreme Court has acknowledged that in sexual assault cases, the complaining witness' credibility is critical. *State v. Ali, supra*. Thus, prior fabricated accusations of sexual assault are highly probative of a complaining witness' credibility. *Id.* In such cases, evidentiary constraints must sometimes yield to a defendant's right of cross-examination. *Id.*

In this case, the district court's order denying Bershon post-conviction relief does little more than state that the court found that each ineffective assistance of counsel claim was speculative. The order is silent as to what portions of the record the district court considered when determining Bershon's trial counsel was not ineffective for failing to present evidence of the Michigan allegations. Thus, we are unable to discern what the district court's determination was as to counsel's reasoning for not utilizing this evidence as a part of his trial strategy or why, had this evidence been admitted, there was not a reasonable probability that the result at trial would have been different.

[14,15] The Supreme Court has held that in cases where the alleged ineffectiveness of counsel was not raised or ruled on at the trial level, an evaluation of defense counsel's actions would require an evaluation of trial strategy and of matters not contained in the record. See *State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007). The Supreme Court has also cautioned that it is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal. *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021). However, in at least one case, the Supreme Court has determined a defense counsel's trial strategy based upon counsel's cross-examination of the victim and counsel's closing argument. See *id.*

The State argues that defense counsel had a reasonable strategy to preclude evidence of the Michigan allegations: had these allegations been adduced at trial, there would have been conflicting assertions about whether and to what extent those allegations were true. The State asserts that if Bershon had cross-examined B.B. on her retraction of the allegations, it would have countered with an assertion that the Michigan allegations were, in fact, true. The State argues that in light of B.B.'s intellectual disability, it would not be unreasonable for a jury to conclude that she incorrectly recanted the allegations in 2005.

At the outset, we note that the State's argument focuses less on defense counsel's strategy and more on the State's hypothetical strategy had the Michigan allegations been presented at trial. Moreover, the State's proposed rehabilitation of B.B. would have still left the jury with a question as to her credibility. As stated earlier, the credibility of a complaining witness in a sexual assault case is significant. See *State v. Ali, supra*. The fact that B.B. had previously alleged sexual assault against Bershon, only to later recant her allegation and inform the police she had lied, goes directly to her credibility as a complaining witness in this case.

For purposes of our analysis, we assume that the Michigan allegations were admissible under the test outlined in *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). We also note that the State sought to present the evidence of the Michigan allegations at trial. Trial counsel for Bershon chose to resist the State's efforts. Keeping all of these issues in mind, we find that in this case, the record on appeal is insufficient to determine whether Bershon received ineffective assistance of counsel when counsel chose to pursue a strategy of keeping all evidence regarding the Michigan allegations from the jury's consideration. We note that had trial counsel not resisted the § 27-414 motion, further evidence of a history of sexual abuse on Bershon's part would have been presented to the jury. The question then becomes, given all of the circumstances present in the case, whether trial counsel reasonably believed that allowing the Michigan allegations to be presented to the jury as past offenses of sexual assault committed by Bershon against B.B. would be more detrimental to Bershon's defense than his being able to show that B.B. eventually recanted those allegations.

Why trial counsel did not seek to admit the Michigan allegations as evidence of prior false allegations made by B.B. against Bershon is unclear on the existing record. The record contains a possible indication that counsel was unsure of whether he could subpoena an out-of-state witness to testify at the § 27-414 hearing. Before the hearing, counsel asked the court if he was "supposed to fly in this law enforcement officer from Michigan." At the hearing, counsel remarked that "we can't bring the author [of the Michigan police report] in to verify the veracity of the report." Whether counsel believed that this inability was due to the lack of a legal mechanism to secure an out-of-state witness (which, considering Neb. Rev. Stat. § 29-1908 (Reissue 2016), would be untrue) or due to a true lack of knowledge concerning the whereabouts of the author is unclear. The former explanation could

theoretically raise concerns about the effectiveness of trial counsel's performance.

In counsel's closing argument, he revealed his theory of the case, which was that Leman had manipulated B.B. to fabricate the allegations of sexual assault against Bershon. Evidence that B.B. had previously recanted allegations of sexual assault against Bershon may have bolstered that theory. Because our record does not demonstrate the totality of the circumstances that trial counsel may have considered, we cannot determine whether counsel declined to present this evidence pursuant to a reasonable defense strategy or lack thereof. An evidentiary hearing is necessary to explore trial counsel's strategy and determine whether counsel's performance was deficient.

Furthermore, on the record before us, we cannot assume that Bershon was not prejudiced by trial counsel's decision. We therefore hold that the district court erred in denying this portion of Bershon's motion for postconviction relief without a hearing. We reverse this decision of the district court and remand the cause with directions to hold an evidentiary hearing on this claim of ineffective assistance of counsel.

*Failure to Investigate Contents*
*of Bershon's Cell Phone.*

Bershon contends that trial counsel was ineffective because counsel failed to investigate the contents of his cell phone. He alleges that an investigation of the phone would have definitively shown that he did not confess any crimes to Leman via text or voicemail and that this evidence would have led to a different outcome at trial. The State counters that this claim is without merit because Bershon cannot show deficient performance or prejudice. The State points out that even if it was shown that Bershon's phone did not contain evidence of texts or calls sent to Leman, this would not negate the possibility that he deleted the information from his phone. In other words, the State argues that an examination of the phone would not have definitively established that the confessions did not occur.

[16-18] We agree with the State that Bershon cannot show that his trial counsel performed deficiently or that he was prejudiced by any allegedly deficient performance. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021). In assessing deficiency in counsel's performance, a court presumes that counsel "'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* at 431, 966 N.W.2d at 855 (quoting *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance. *State v. Wood, supra.* We do not use perfect hindsight to criticize unsuccessful trial strategies or second-guess trial strategy. *Id.* There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

It was not an unreasonable decision for counsel to forgo an investigation of Bershon's cell phone. Even if we assume that Bershon's assertion is correct that no incriminating text or voicemail would have been found on his phone, the possibility that Bershon had simply deleted the messages from his phone would not be negated. A lawyer using reasonable professional judgment could conclude that investigating Bershon's phone would not be helpful and could result in an unexpected and potentially harmful discovery. We also note that Bershon's trial counsel thoroughly cross-examined Leman about the alleged messages. Leman admitted that despite providing law enforcement with other items she believed relevant to the case, and despite having at least 30 days to turn the messages over, she never did so. In closing arguments, counsel described the messages as "the most incriminating evidence" in Leman's possession and argued that the most likely reason Leman did

not provide the messages to law enforcement was because they did not exist.

Since we find that Bershon's trial counsel was not deficient in his decision not to have Bershon's cell phone examined, we need not address prejudice. We find that trial counsel's decision not to pursue an investigation of Bershon's phone was reasonable. This claim of ineffective assistance of trial counsel was properly denied without an evidentiary hearing.

*Failure to Offer Independent Evaluation of B.B.'s Mental Capacity.*

Bershon asserts that trial counsel was ineffective because counsel did not have B.B. independently evaluated. He specifically asserts that an independent evaluation would have shown that B.B. had the mental capacity to appraise the nature of sexual conduct and had the ability to resist unwanted sexual contact, thus negating one of the State's theories of the case that B.B. was incapable of resisting or appraising the nature of her conduct. Bershon contends that, had his trial counsel offered an independent evaluation, a reasonable probability exists that the outcome of trial would have been different.

The State argues that this claim was properly denied without an evidentiary hearing because it contains insufficient allegations. The State claims that Bershon failed to specifically allege the expert testimony that his trial counsel should have produced at trial. Additionally, the State argues that this claim is without merit because Bershon cannot show that his trial counsel was ineffective for failing to offer an independent evaluation of B.B. given that it was undisputed that B.B. is intellectually disabled.

[19] In a motion for postconviction relief, a defendant is required to specifically allege what the testimony of potential witnesses would have been had they had been called at trial in order to avoid dismissal without an evidentiary hearing. *State v. Cox*, 314 Neb. 104, 989 N.W.2d 65 (2023). Absent specific allegations, a motion for postconviction relief effectively

becomes a discovery motion to determine whether evidence favorable to a defendant's position actually exists. *Id.*

In his postconviction motion, Bershon does not identify a potential expert witness or what evidence that witness would have provided to bolster Bershon's defense. Bershon states only that an independent examination would show that B.B. could appraise the nature of sexual conduct and was capable of resisting the same. This is a conclusory statement of law, not a specific allegation of testimony. Further, to the extent that we can assume that an expert witness would have supported Bershon's theory of defense, Bershon has not shown how that defense would have been successful. At trial, a school psychologist and a clinical psychologist, both having personally tested B.B., testified that she had an extremely low IQ and was intellectually disabled. The school psychologist was involved with assessing B.B.'s educational needs and abilities from 2007 through 2014. Leman and Jessica similarly testified that B.B. had the mentality of a young child. B.B. herself testified to her own limitations, her enrollment in special education courses, and her participation at the Special Olympics. The evidence unequivocally showed that B.B. has a substantial mental impairment and is fully dependent upon Leman for day-to-day functioning. In closing argument, trial counsel acknowledged that the jury could observe that B.B. was disabled.

In his motion, Bershon does not explain how expert testimony would have established that B.B.'s intellectual disability was not significant. Thus, he has not shown that trial counsel's allegedly deficient performance prejudiced his defense. The district court did not err when it rejected this claim without conducting an evidentiary hearing.

### Failure to Call Joshua as Witness.

Bershon argues that trial counsel was ineffective because counsel failed to call Joshua as a witness. Bershon asserts that Joshua's testimony would have demonstrated Bershon's lack of propensity to engage in sexual abuse, "impugned the

credibility of B.B. and [Leman]," and shown that "Bershon's children were not unified in any belief of his guilt." Brief for appellant at 26. Bershon also asserts that Joshua's testimony would have enhanced Bershon's credibility and would have likely resulted in a different outcome at trial.

In response, the State argues that the district court properly denied this claim without an evidentiary hearing because Bershon cannot show prejudice. The State points out that it was undisputed that Joshua was not present when Bershon was alleged to have sexually abused B.B. Further, the State observes that even if Joshua testified as Bershon suggests, his testimony, at most, would have been his opinion as to the character of Bershon, B.B., and Leman, and that his opinion would be scrutinized by the jury for objectivity and impartiality.

We agree with the State that, given the other evidence adduced at trial, there is not a reasonable probability that Joshua's purported testimony would have changed the outcome of the trial. Joshua's purported support of his father would have been general in nature. It would not specifically address B.B.'s and Leman's specific testimony regarding their observation of Bershon's abuse of B.B. and B.B.'s reluctance to disclose it. Thus, Bershon has failed to establish prejudice, and this claim of ineffective assistance of trial counsel was properly denied without an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, we find that the district court erred when it denied Bershon postconviction relief without an evidentiary hearing on his claim that trial counsel was ineffective for failing to present evidence of B.B.'s recantation of prior allegations of sexual abuse. We reverse this portion of the court's order and remand the cause for an evidentiary claim on this single claim. The order of the district court is otherwise affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.